# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
November 20, 2012

Lyle W. Cayce
Clerk

No. 10-70031

RICKEY LYNN LEWIS,

Petitioner-Appellant

v.

RICK THALER, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent-Appellee

Appeal from the United States District Court
for the Eastern District of Texas

Before JOLLY, DAVIS, and GARZA, Circuit Judges.

GARZA, Circuit Judge:

Petitioner Rickey Lynn Lewis filed a successive federal habeas petition, contending he is mentally retarded and ineligible for execution under *Atkins v. Virginia*, 536 U.S. 304 (2002) (holding that execution of mentally retarded criminals is "cruel and unusual punishment" prohibited by Eighth Amendment). The district court denied relief, but granted a certificate of appealability ("COA") on the issue of whether the state court's determination that Lewis did not establish by a preponderance of the evidence that he had significantly subaverage general intellectual functioning was unreasonable. We conclude that

No. 10-70031

the state court's determination was not unreasonable, and we AFFIRM the judgment of the district court.

## I

In 1993, a state court jury convicted Lewis of capital murder and sentenced him to death. *State v. Lewis*, No. 13160, 1993 WL 13634358 (217th Dist. Ct., Angelina County, Tex. June 24, 1993). Lewis appealed, and the Texas Court of Criminal Appeals ("TCCA") upheld the conviction but remanded for resentencing. *Lewis v. State*, No. 71,887 (Tex. Crim. App. June 19, 1996) (unpublished). On remand, the trial court again sentenced Lewis to death, and the TCCA affirmed. *Lewis v. State*, No. 71,877 (Tex. Crim. App. June 23, 1999) (unpublished). Lewis did not petition for review by the United States Supreme Court.

In 2000, Lewis was denied state habeas relief. *Ex parte Lewis*, No. 44,725-01 (Tex. Crim. App. Apr. 19, 2000) (unpublished). Lewis was also denied federal habeas relief, and we affirmed the denial. *Lewis v. Cockrell*, 58 F. App'x 596 (5th Cir. 2003). The Supreme Court denied Lewis's petition for certiorari. *Lewis v. Dretke*, 540 U.S. 841 (2003).

In 2002, the Supreme Court held for the first time that execution of mentally retarded criminals is "cruel and unusual punishment" prohibited by the Eighth Amendment. *Atkins*, 536 U.S. at 321. Lewis subsequently filed a successive state habeas application, citing *Atkins* and contending that he is mentally retarded. Texas law defines mental retardation as "(a) significantly subaverage general intellectual functioning (proven by showing an IQ below 70) and (b) deficits in adaptive behavior that (c) originated during the developmental period (before age 18)." *Chester v. Thaler*, 666 F.3d 340, 346 (5th Cir. 2011) (citation omitted); *accord Ex parte Briseno*, 135 S.W.3d 1, 8 (Tex. Crim. App. 2004)); *see also Atkins*, 536 U.S. at 317 ("[W]e leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their]

2

execution of sentences." (quoting *Ford v. Wainwright*, 477 U.S. 399, 416–417 (1986)).

The TCCA stayed Lewis's scheduled execution and ordered the state trial court to conduct a hearing regarding Lewis's *Atkins* claim. *Ex parte Lewis*, No. 44725-02, 2003 WL 21751491 (Tex. Crim. App. July 24, 2003). The parties presented large amounts of documentary evidence as well as expert testimony on the issue of Lewis's alleged mental retardation. Central to this appeal are the testimonies of four experts, summarized as follows:

(1) Dr. Susana A. Rosin is a clinical psychologist with a Ph.D. and is licensed to administer cognitive tests to diagnose mental retardation. The State of Texas retained Dr. Rosin to evaluate Lewis, and she administered to him the Stanford-Binet Fifth-Edition ("SB 5") test, accepted in the psychological community as an accurate method of ascertaining IQ. Dr. Rosin determined that Lewis has an IQ of 79. (2) Dr. Stephen Martin is a neuropsychologist in private practice with Health South Rehabilitation Hospital. He administered the Wechsler Adult Intelligence Scale III (WAIS III) to Lewis and determined that Lewis has an IQ of 59. (3) Dr. Richard Garnett is not a licensed psychologist but has a Ph.D. in psychology. He testified that Dr. Rosin's test results were scored incorrectly and, based on the same data used by Dr. Rosin, concluded that Dr. Rosin's score should have been 75. He also testified that Lewis has a "third grade" intellectual level and that he could not rule out a score of 79. (4) Dr. Edward Gripon is a licensed psychiatrist with a sub-specialty in forensic psychiatry. After evaluating Lewis and reviewing all of the documentation available to him, he testified that an IQ of 59 was not consistent with his evaluation and Lewis's intellectual potential was more consistent with an IQ of 70. The state court found Drs. Gripon and Rosin more credible than Drs. Martin and Garnett, and, considering all of the evidence in the record, concluded that Lewis had not proven by a preponderance of the evidence that he had

No. 10-70031

significantly subaverage general intellectual functioning. *See Ex parte Lewis*, No. 01-91-32 (114th Dist. Ct., Smith County, Tex. Feb. 14, 2005) (Findings of Fact and Conclusions of Law) (hereinafter, "FFCL"). The TCCA agreed with the trial court and denied relief. *Ex parte Lewis*, No. 44725-02 (Tex. Crim. App. Jun. 29, 2005).

After the state habeas trial court's decision, but before the TCCA's decision, we permitted Lewis to file a successive federal habeas application under 28 U.S.C. § 2254, conditioned on denial of relief by the TCCA. When the TCCA denied relief, the federal district court granted Lewis's motion to stay the execution, and Lewis filed the successive federal habeas petition at issue.

On habeas review, the district court refused to consider the affidavit of Dr. Gale Roid, who testified that Dr. Susana Rosin's IQ score of 79 was invalid. The district court reasoned that § 2254 prevented Lewis from presenting the affidavit for the first time on federal habeas review. The district court ultimately concluded that the state court's determination that "Lewis had failed to prove by a preponderance of the evidence that he had significantly subaverage general intellectual functioning" was not "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings." *Lewis v. Quarterman*, No. 5:05CV70, 2007 WL 1830748, at *3–4 (E.D. Tex. Jun. 22, 2007). Accordingly, it did not examine the other two elements of Lewis's mental retardation claim (deficits in adaptive behavior and onset before age 18).

On appeal, we vacated the district court's judgment and remanded for rehearing, concluding that the district court erred by excluding Dr. Roid's affidavit. *Lewis v. Quarterman*, 541 F.3d 280 (5th Cir. 2008). We reasoned that where evidence introduced for the first time on federal review supplements, rather than fundamentally alters, the claims made in state court, we analyze such evidence under the "exhaustion" rubric of § 2254(b), rather than as an issue

4

of "factual development" under § 2254(d). *Id.* at 284 (citing *Dowthitt v. Johnson*, 230 F.3d 733, 745 (5th Cir. 2000)). We reasoned that Dr. Roid's testimony was "not material additional evidence," and that Lewis therefore had met the requirements of § 2254(b). *Id.* at 285.

On remand, the district court reconsidered Lewis's claims in light of all the evidence, including Dr. Roid's affidavit, and again denied relief. *Lewis v. Thaler*, No. 5:05CV70, 2010 WL 4119239 (E.D. Tex. Oct. 19, 2010). The district court granted a COA with respect to whether the State court's determination that Petitioner did not establish by a preponderance of the evidence that he had significantly subaverage general intellectual functioning was reasonable. Lewis's appeal of that decision is now before us.

## II

"In a habeas corpus appeal, we review the district court's findings of fact for clear error and its conclusions of law *de novo*, applying the same standards to the state court's decision as did the district court." *Busby v. Dretke*, 359 F.3d 708, 713 (5th Cir. 2004).

Section 2253(c) strictly limits our appellate jurisdiction to the issues on which the applicant has been granted COA. *See* 28 U.S.C. § 2253(c) ("Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from [ ] the final order in a habeas corpus proceeding . . . ."); *Carty v. Thaler*, 583 F.3d 244, 266 (5th Cir. 2009) ("Because neither we nor the district court granted Carty a COA on this issue, we lack jurisdiction to consider this claim."). Accordingly, we ask only whether the State court's determination that Petitioner did not establish by a preponderance of the evidence that he had significantly subaverage general intellectual functioning was unreasonable.[1] In order to answer this question, we must first discuss the

---

[1] Lewis contends we should order our analysis to first determine whether there was a constitutional violation in his case, and then, if so, to inquire whether AEDPA permits relief.

No. 10-70031

habeas statute generally and the Supreme Court's recent construction of it in *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011).

## III

Section 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), sets certain limits on a federal court's power to grant a state prisoner's application for a writ of habeas corpus. Section 2254(a) provides that a federal court may entertain an application for a writ of habeas corpus "only on the ground that [an applicant] is in custody in violation of the Constitution or laws or treaties of the United States." § 2254(a). Sections 2254(b) and (c) prohibit a federal court from granting such an application unless, with certain exceptions, the applicant has exhausted state remedies. If these first hurdles have been cleared, § 2254(d) applies some additional restrictions, requiring that the application,

> [S]hall not be granted with respect to any claim that was adjudicated on the merits in State Court proceedings unless adjudication of the claim:
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d). Section 2254(e)(1) also requires that a State court's factual determinations "shall be presumed to be correct" and that a federal court shall not hold an evidentiary hearing unless the applicant shows that the claim relies

---

In support, he cites *Berghuis v. Thompkins*, 130 S. Ct. 2250 (2010). However, *Thompkins* merely stands for the proposition that a federal habeas court *may*, when it is unclear whether AEDPA deference applies, engage in *de novo* review and deny § 2254 relief because an applicant who is not entitled to relief under a *de novo* standard of review necessarily will not be entitled to relief under the less favorable standard of AEDPA deference. *See id.* at 2265 ("Courts can, however, deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review, *see* § 2254(a).").

No. 10-70031

on a new rule of constitutional law made retroactive by the Supreme Court, or relies on a factual predicate that could not have been previously discovered. § 2254(e); *Williams v. Taylor*, 529 U.S. 420, 431–35 (2000).

Lewis contends that the district court incorrectly merged §§ 2254(a), (d)(1), and (e)(1) by requiring Lewis to show by clear and convincing  evidence that the state court's factual determinations were unreasonable. According to Lewis, this requirement contravened the Supreme Court's decision in *Miller-El v. Cockrell*, 537 U.S. 322 (2003).  In *Miller-El*, the circuit court interpreted § 2254 as requiring petitioner to prove that the state-court decision was objectively unreasonable by clear and convincing evidence. *Id.* at 325. The Supreme Court reversed, explaining:

> It was incorrect for the Court of Appeals, when looking at the merits, to merge the independent requirements of §§ 2254(d)(2) and (e)(1).  AEDPA does not require a petitioner to prove that a decision is objectively unreasonable by clear and convincing evidence.  The clear and convincing evidence standard is found in § 2254(e)(1), but that subsection pertains only to state-court determinations of factual issues, rather than decisions.

*Id.* at 341.

Although we note that the district court in this case at times used the terms "decision" and "findings" loosely, we do not read its opinion as extending the clear and convincing evidence standard beyond its appropriate reach. *See Lewis,* No. 5:05-CV-70, 2010 WL 4119239 at *2 ("The AEDPA requires this Court to presume the correctness of the state court's *factual findings* unless Petitioner rebuts this presumption with 'clear and convincing evidence.'") (emphasis added).  The district court treated the state court's determination that Lewis failed to show subaverage intellectual functioning as a fact finding subject to § 2254(e)(1) deference, an approach which is consistent with our precedents. *See, e.g.*, *Maldonado v. Thaler*, 625 F.3d 229, 236 (5th Cir. 2010) ("The question of

7

whether a defendant suffers from mental retardation involves issues of fact, and thus is subject to a presumption of correctness that must be rebutted by clear and convincing evidence under § 2254(e)(1)."); *Woods v. Quarterman*, 493 F.3d 580, 587 (5th Cir. 2007) ("[T]o the extent Woods argues that the state court's decision was 'based on an unreasonable determination of the facts in light of the evidence presented,' 28 U.S.C. 2254(d)(2), he has failed to rebut, by clear and convincing evidence, the presumption that the state court's factual findings are correct.") (citing § 2254(e)(1)).

In short, for Lewis to prevail on a claim of factual error, he must both (1) rebut the state court's *finding* that Lewis failed to show subaverage intellectual functioning with clear and convincing evidence, § 2254(e)(1), and show the state court's *decision* "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2).

## IV

Also at issue on appeal is whether § 2254 allows a federal habeas court to consider Dr. Roid's affidavit. This question is before us again because of the Supreme Court's recent decision in *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011). In *Pinholster*, a California defendant who was convicted of first-degree murder and sentenced to death sought habeas relief in the California Supreme Court, alleging that his trial counsel failed to adequately investigate and present mitigating evidence during the penalty phase. *Id.* at 1396–97. After the State Supreme Court denied Pinholster's claims on the merits, he filed a federal habeas application. *Id.* at 1397. The district court held an evidentiary hearing, during which Pinholster and the State each presented medical expert testimony on Pinholster's mental health. *Id.* The district court granted Pinholster habeas relief. *Id.* On appeal, an en banc court of the Ninth Circuit considered the new evidence adduced at the evidentiary hearing and affirmed the district court's judgment. *Pinholster v. Ayers*, 590 F.3d 651, 666 (9th Cir. 2009) (en banc)

No. 10-70031

("Congress did not intend to restrict the inquiry under § 2254(d)(1) only to the evidence introduced in the state habeas court").  The Supreme Court reversed, holding that federal courts are limited to the state court record on habeas review:

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.  Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law.  This backward-looking language requires an examination of the state-court decision at the time it was made.  It follows that the record under review is limited to the record in existence at that same time *i.e.*, the record before the state court.

*Pinholster*, 131 S. Ct. at 1398.

In *Dowthitt v. Johnson*, 230 F.3d 733, 745–46 (5th Cir. 2000), we entertained a similar question to the one before the *Pinholster* Court.  In *Dowthitt*, we explained that affidavits presented for the first time on federal habeas review presented an issue "more accurately analyzed under the 'exhaustion' rubric of § 2254(b)," rather than as an issue of "factual development" under §§ 2254(d) and (e).  *Id.* at 745.  We concluded that the district court could consider the affidavits because "Dowthitt had presented to the state habeas court his assertions of mental illness" and "[t]he [new] affidavits add[ed] little to those claims."  *Id.* at 746.  More recently, in *Morris v. Dretke*, 413 F.3d 484 (5th Cir. 2005), we concluded that a district court could consider "IQ scores and expert assessment of those scores" which were not previously presented to the state habeas court because "Morris's *Atkins* claim was not presented to the federal court in a significantly different legal posture than in the state courts." *Morris*, 413 F.3d at 498.  We explained that "this Circuit classifies these specific cases as presenting the question whether the new evidence, not previously presented to the state courts but presented for the first time to the federal court,

9

No. 10-70031

has met the exhaustion requirement of § 2254(b)(1)(A)." *Id.* (internal citations omitted). As discussed above, we reached the same conclusion regarding Dr. Roid's affidavit, citing both *Dowthitt* and *Morris*, in our previous decision to remand. *Lewis*, 541 F.3d at 285.

However, the *Pinholster* Court rejected the argument that a federal court can consider evidence for the first time on habeas review when determining whether an applicant has shown error under § 2254(d)(1) as long as it "simply supports" an adjudicated claim:

> [The State] asserts that some of the evidence adduced in the federal evidentiary hearing fundamentally changed Pinholster's claim so as to render it effectively unadjudicated. Pinholster disagrees and argues that the evidence adduced in the evidentiary hearing simply supports his alleged claim.
> We need not resolve this dispute because, even accepting Pinholster's position, he is not entitled to federal habeas relief. Pinholster has failed to show that the California Supreme Court unreasonably applied clearly established federal law on the record before that court, which brings our analysis to an end. Even if the evidence adduced in the District Court additionally supports his claim, as Pinholster contends, we are precluded from considering it.

*Id.* at 1402 n.11 (internal citations omitted). Moreover, the *Pinholster* Court explained that the exhaustion requirement of § 2254(b) is a reinforcement of, rather than an escape hatch from, the rule that a federal habeas court's review is limited to the state court record:

> This understanding of the text is compelled by "the broader context of the statute as a whole," which demonstrates Congress' intent to channel prisoners' claims first to the state courts. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997). "The federal habeas scheme leaves primary responsibility with the state courts . . . ." *Visciotti*, *supra*, at 27, 123 S. Ct. 357. Section 2254(b) requires that prisoners must ordinarily exhaust state remedies before filing for federal habeas relief. It would be contrary to that purpose to allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a

federal habeas court and reviewed by that court in the first instance effectively *de novo*.

*Pinholster*, 131 S. Ct. at 1398–99. While the Court acknowledged that "state prisoners may sometimes submit new evidence in federal court[,]" it also tacitly counseled against circumventing the requirements of § 2254(d) and (e) in order to bring in the new evidence. *Id.* at 1401 ("Provisions like §§ 2254(d)(1) and (e)(2) ensure that '[f]ederal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.'" (quoting *Williams*, 529 U.S. at 437).

This is not the first time we have recognized the rule from *Dowthitt* is in contradiction with *Pinholster*. In *Clark v. Thaler*, in light of *Pinholster*, we implicitly rejected the reasoning of *Dowthitt* and held a federal habeas court considering a claim under 28 U.S.C. § 2254(d) could not review mitigating evidence that was unavailable to the state trial court. 673 F.3d 410, 416–17 (5th Cir. 2012) (holding review under § 2254(d)(1) limited to record of state court that adjudicated claim on the merits). In *Ibarra v. Thaler*, we likewise implicitly rejected the reasoning of *Dowthitt* when we held *Pinholster* barred the federal habeas court from reviewing *Atkins* evidence that was not a part of the state court record. *Ibarra v. Thaler*, 691 F.3d 677, 682 (5th Cir. 2010) (rejecting petitioner's argument that new affidavits were admissible because they supplemented rather than fundamentally altered his state court claim). Here we explicitly reject *Dowthitt's* holding that where new affidavits supplement rather than fundamentally alter a state court claim, they may be admissible for review of a habeas claim under § 2254(d).

Lewis's arguments to the contrary are unpersuasive. He contends that *Pinholster* does not conflict with our previous holding because (1) a federal court may conduct a "§ 2254(a) analysis" to determine whether Lewis can prove mental retardation with any evidence; (2) *Pinholster* only affects habeas claims

previously rejected by state courts via summary disposition and/or in the absence of fact development later accomplished in federal court; and (3) Roid's affidavit merely introduces a new way of looking at the existing record evidence, much like a law review article. Nothing in *Pinholster* suggests we should construe its straightforward holding in any of these ways.

The import of *Pinholster* is clear: because Lewis's claims have already been adjudicated on the merits, § 2254 limits our review to the record that was before the state court. Accordingly, our previous decision to remand is no longer based on a correct statement of the law. The district court was correct in the first instance to ignore Dr. Roid's affidavit, and we do not consider it below.

**V**

We turn now to the merits of Lewis's application. As discussed above, § 2254 does not permit a federal court to grant a habeas application unless the applicant can show legal error under § 2254(d)(1) or factual error under § 2254(d)(2).

To establish legal error under § 2254(d)(1) , the applicant must show that the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1). "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law," *Id.* at 410, and "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fair-minded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

To establish factual error under § 2254(d)(2), the applicant must show that the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the

No. 10-70031

State court proceeding." § 2254(d)(2).   Section 2254 also requires that determinations of fact issued by state courts are "presumed to be correct," and that they not be disturbed unless an applicant rebuts the presumption with clear and convincing evidence.  § 2254(e)(1).  "[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (citing § 2254(d)(2)).

## A

Lewis alleges the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States." § 2254(d)(1).  Lewis asserts the state court's application of *Briseno* factors was "unscientific" and in contradiction with the Supreme Court's decision in *Atkins*.  While the state court relied heavily on Lewis's IQ scores when determining whether he had subaverage intelligence, the court also considered Lewis's school records, testimony from Lewis's mother, Lewis's criminal history, Lewis's incarceration records, and Lewis's abilities as a pro se litigant. Lewis maintains the district court improperly focused on Lewis's behavior rather than his test scores when evaluating his intellectual functioning.  Lewis alleges the state judge's erroneous application of the *Briseno* factors improperly excludes mildly mentally retarded people, such as Lewis, from *Atkins'* protection.

Although testing is the primary means for ascertaining IQ, the *Briseno* court considered other evidence in evaluating the probative value of the test scores.  *See Ex parte Briseno*, 135 S.W.3d at 14.  The *Briseno* court's definition of significantly subaverage intellectual functioning mandates the conclusion that courts are permitted to look at factors other than IQ tests when assessing this prong.  *Id.*  The *Briseno* court explained that, although an IQ of 70 is generally

accepted as the cut off for subaverage general intellectual functioning, this cut off is not absolute:

> Significantly subaverage intellectual functioning is defined as an IQ of about 70 or below (approximately 2 standard deviations below the mean). Psychologists and other mental health professionals are flexible in their assessment of mental retardation; thus, sometimes a person whose IQ has tested above 70 may be diagnosed as mentally retarded while a person whose IQ tests below 70 may not be mentally retarded. Furthermore, IQ tests differ in content and accuracy.

*Ex parte Briseno*, 135 S.W.3d at 7 n.24 (internal citations and quotation marks omitted). The *Briseno* court adopted the trial court's finding that "[t]he preponderance of the evidence does not show that these test scores over-state the actual intellectual functioning of Applicant; the evidence in fact showed that there are good indications that the test scores understated Applicant's intellectual functioning." *Id.* at 14. The applicant's two most recent IQ scores were 72 and 74, and the experts disagreed about whether "the standard plus or minus 5 points to accommodate the statistical standard error of measurement should apply." *Id.* at 14, n.53 (internal quotation marks omitted). The court held there was "not enough evidence in [the] record" to prove, by a preponderance of the evidence, that the applicant's true IQ was "lower than 72-74 rather than higher than 72-74." *Id.* Therefore, under Texas law, courts may consider other evidence in the record when determining if IQ scores are reliable indicators of intelligence.

When the *Briseno* court set forth a list of factors courts might look to when "weighing evidence indicative of mental retardation," the court was ambiguous as to whether these factors applied only to the "adaptive deficit" inquiry or also to the two other prongs of the analysis.[2]

---

[2] The factors the *Ex parte Briseno* court listed are:

No. 10-70031

> The *adaptive behavior* criteria are exceedingly subjective, and undoubtedly experts will be found to offer opinions on both sides of the issue in most cases. There are, however, some other evidentiary factors which factfinders in the criminal trial context might also focus upon in weighing evidence as indicative of *mental retardation* or of a personality disorder.

*Ex parte Briseno*, 135 S.W.3d 1, 8–9 (Tex. Crim. App. 2004) (emphasis added). Courts have subsequently interpreted the factors the *Briseno* court enumerated as applying to all three prongs of Texas's *Atkins* analysis. *See, e.g.*, *Ex parte Butler*, No. WR-41,121-02, 2012 WL 2400634, at *6–7 (Tex. Crim. App. June 27, 2012) (considering applicant's school records as evidence applicant did not have significantly subaverage intellectual functioning); *Neal v. State*, 256 S.W.3d 264, 272–73 (Tex. Crim. App. 2008) (listing the *Briseno* factors as "[f]actors relevant to evaluating the three prongs" of Texas's *Atkins* analysis). The *Briseno* factors are therefore applicable to all three prongs of Texas's *Atkins* analysis.

Lewis's allegation that applying the *Briseno* factors to the first prong of our *Atkins* analysis somehow contradicts *Atkins* is unfounded. We have

---

- Did those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—think he was mentally retarded at that time, and, if so, act in accordance with that determination?
- Has the person formulated plans and carried them through or is his conduct impulsive?
- Does his conduct show leadership or does it show that he is led around by others?
- Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?
- Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?
- Can the person hide facts or lie effectively in his own or others' interests?
- Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

*Ex parte Briseno*, 135 S.W.3d at 8–9.

previously rejected assertions that the *Briseno* factors are in conflict with *Atkins*. "The *Briseno* court, in other words, fashioned these evidentiary factors as a means of developing appropriate ways to enforce the constitutional restriction set out in *Atkins*. And on their face, nothing about them contradicts *Atkins*, as they were developed explicitly to comply with Atkins." *Chester v. Thaler*, 666 F.3d 340, 346–47 (5th Cir. 2011) (internal quotation marks omitted) (rejecting petitioner's argument that Texas courts must follow AAMR procedures when determining subaverage intelligence).

Therefore, we hold the state court's application of the *Briseno* factors to inform its analysis of Lewis's competing IQ scores was not contrary to nor an unreasonable application of clearly established federal law.

**B**

Lewis also alleges factual error under § 2254(d)(2). Lewis maintains the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Specifically, Lewis contends (1) there are no circumstances in which a state court could reasonably rely on Dr. Rosin's IQ score of 79; (2) exclusion of Dr. Martin's testimony was objectively unreasonable; (3) exclusion of Dr. Garnett's testimony was objectively unreasonable; (4) reliance on Dr. Gripon's opinions about mental retardation was objectively unreasonable; (5) the state court's rejection of other testimony was unreasonable; and (6) the state court's embrace of anonymously scored prison IQ tests was unreasonable.

Lewis first contends that the state court's reliance on Dr. Rosin's score was unreasonable because the court's findings conceded that Dr. Rosin "did not exactly follow all of the instructions for the application of the assessment instrument,"[3] FFCL at 14, and because she scored Lewis's "abbreviated IQ" at

---

[3] In her trial testimony Dr. Rosin admitted to making several errors during the administration of the exam. In Dr. Rosin's opinion the errors she made did not have a

No. 10-70031

58.[4]   While the errors Dr. Rosin made in administering the exam call into question the reliability of Lewis's score on the exam, the state court's conclusion that a score of 79 was reliable was based on "all appropriate evidence before the Court" after the state court "determined the credibility and weight to be given such evidence." *Id.* at 34.  The state court did not, as Lewis contends, "pin" its determination on Dr. Rosin's score alone, but relied also on Dr. Gripon's score of 70, *id.* at 26; Dr. Garnett's re-score of 75, *id.* at 18; Dr. Garnett's testimony that he could not say for sure that Dr. Rosin's score of 79 was invalid, *id.*; Lewis's education records, *id.* at 31; his spoken and written coherence in court proceedings and legal documents, *id.* at 32–33; and his history of committing crimes requiring premeditation and deliberation, *id.* at 32.

---

substantial impact on the validity of Lewis's IQ score.  (Rosin Test. 323:2–10, Dec. 6, 2004).  The errors Dr. Rosin admitted to making include (1) giving Lewis two points for the definition he provided for "eyelash" when his answer only deserved one point, *id.* at 55:16–56:10, (2) not precisely following the instructions for a block exercise, *id.* at 60:19–63:9, and (3) giving Lewis a point more than he deserved on a math problem, *id.* at 66:4–67:18.  Dr. Rosin also admitted she might not have followed the instructions for one of the subtests correctly.  *Id.* at 74:5–19.

Dr. Rosin's judgment in scoring other questions was at least questionable.  For example, when Dr. Rosin asked Lewis to define puddle he said "water in a spot."  The scoring manual defined a puddle as, "[w]ater left over after it rains; water on the sidewalk; a small depression filled with water; a small pool of liquid water."  *Id.* at 52:23–55:6.  Dr. Rosin gave Lewis full credit for his response though his answer had substantially less nuance than the scoring manual's definition.  *Id.*  When Dr. Rosin asked Lewis to define curiosity, he stated, "to be thinking about something you search or look at it."  *Id.* at 56:11–57:10.  The scoring manual's definition of curiosity was "wanting to know about something, wondering about something that might happen, a strange, rare, or unusual thing."  *Id.* Dr. Rosin gave Lewis full credit for his response, *id.*, even though Lewis's definition arguably provided less depth of information than the scoring manual required for a full credit response.

[4] Lewis explains that there are two abbreviated IQ tests contained within the SB 5 that may be scored separately and are used to verify the accuracy of the overall SB 5 score.  He contends that his abbreviated IQ of 58 should have alerted Dr. Rosin that she had misadministered the test and that reliance on a score of 79 by the state court was objectively unreasonable.  Dr. Rosin contends short form IQ tests are not valid or reliable.  (Rosin Test. 339:1–14, Dec. 6, 2004).

Similarly unsatisfying is Lewis's argument that Dr. Rosin, a clinical psychologist licensed to administer tests for mental retardation, was so unqualified as to make the state court's reliance on her testimony unreasonable. Dr. Rosin is familiar with a variety of instruments for psychological testing including the WAIS and Standford-Binet. FFCL at 24. While Dr. Rosin had only administered the SB 5 to her husband and two children before she administered the exam to Lewis, she had administered the previous version of the exam, the SB 4, "about a hundred times." (Rosin Test. 310:1–4, Dec. 6, 2004).

Lastly with respect to Dr. Rosin, Dr. Garnett's testimony does not, as Lewis contends, undermine Dr. Rosin's testimony so far as to render unreasonable the court's reliance on her administration of the SB 5. Dr. Garnett scored Dr. Rosin's test results at 75, which was still above the generally accepted cut-off of 70 and which was not inconsistent with the state court's ultimate conclusion that "the Applicant has failed to prove . . . that [his] true score is lower than 75." FFCL at 34. Lewis contends that the most reasonable interpretation of Dr. Garnett's testimony is that Dr. Rosin's test score was, in Lewis's words, "junk science." Of course, the question for our court is not what is most reasonable, but whether the state court's determination of the facts was unreasonable. We disagree with Lewis's characterization of Dr. Garnett's testimony. Although he expressed doubts about the validity of Dr. Rosin's score, Dr. Garnett also testified that he could not rule out Dr. Rosin's score of 79. *Id.* at 18. In sum, the state court concluded that, whatever errors were made by Dr. Rosin, the entire record supports an IQ of 79. Our review of the record does not suggest that this was an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2).

Lewis contends that the "exclusion" of Dr. Garnett's and Dr. Martin's testimony was unreasonable. Our review of the record suggests that "exclusion"

misrepresents the state court's treatment of the two testimonies. The court's FFCL contains substantial discussion of both and concludes the testimony of Drs. Garnett and Martin was less credible than that of other witnesses. FFCL at 17–19. Neither were the state court's adverse credibility determinations with respect to Drs. Martin and Garnett objectively unreasonable. *See Galvan v. Cockrell*, 293 F.3d 760, 764 (5th Cir. 2002) ("This Court defers to the trier of fact in resolving conflicts requiring credibility determinations."). The state court noted that neither expert reviewed all of the materials made available to them by the State, including facts surrounding the underlying offense, Lewis's prison record, and documentary evidence linked to a failed *pro se* civil rights suit filed by Lewis. FFCL at 18. Lewis responds that the evidence that the two experts ignored was irrelevant to determining Lewis's IQ. In any event, the state court determined that Dr. Garnett "was extremely selective in pointing to evidence that supported an opinion pointing toward a diagnosis of mental retardation and quickly or summarily discount[ed] evidence contradictory to an opinion pointing toward a diagnosis of mental retardation." FFCL at 18–19. Lewis has not shown that the state court's adverse credibility determinations were unreasonable.

We also reject Lewis's contention that it was objectively unreasonable for the state court to rely on Dr. Gripon's opinions about mental retardation. Lewis contends Dr. Gripon was not an adequate expert on mental retardation, particularly mild mental retardation, to diagnose mild mental retardation. The state court found Dr. Gripon to be "fair, unbiased, reliable, and worthy of weighty consideration." FFCL at 24. While Dr. Gripon did not personally administer an IQ test to Lewis, he evaluated Lewis and reviewed the IQ tests and all the documents and materials supplied to him. *Id.* at 24–26. The state court's finding of credibility is entitled to a presumption of correctness that

No. 10-70031

Lewis had the burden of rebutting with clear and convincing evidence, 28 U.S.C. § 2254(e)(1), and Lewis failed to do so.

Lewis further contends the state court's rejection of other testimony was unreasonable. Lewis alleges the state court unreasonably rejected the testimony of Jeff Baynham, Lewis's original trial attorney, who testified he needed to speak to Lewis on a second grade level. The state court permitted Baynham to testify and weighed his testimony along with the other evidence. FFCL at 20. Lewis also alleges the state court unreasonably ignored the testimony of a special education teacher, Louise O'Sullivan, and a special education school administrator, Martha Surles, both from the school Lewis attended, who testified Lewis's presence in the special education program was strong evidence that he was mentally retarded. Martha Surles testified, however, that students in the special school were not necessarily mentally retarded: she testified learning disabled and autistic students also attended the school. *Id.* at 16. Moreover, Louise O'Sullivan testified that though she recognized Lewis as a student at the special school, she did not remember what kind of student he was. *Id.*

Finally, Lewis contends the state court's embrace of anonymously scored prison IQ tests was objectively unreasonable. Some prison documents contained anonymously scored IQ score results that Lewis maintains the state court should not have relied on because there was no evidence the tests were properly administered by trained psychologists. We have held courts do not err by assigning less weight to prison IQ scores than full-length scores, *Rivera v. Quarterman*, 505 F.3d 349, 362 (5th Cir. 2007), but we have not held that it is objectively unreasonable to assign any weight to prison IQ scores. We cannot say it was objectively unreasonable for the state court to assign some weight to Lewis's prison IQ scores.

No. 10-70031

In light of the substantial corroborating evidence, we cannot hold Lewis rebutted the trial court's finding that Lewis does not have significantly subaverage intelligence with "clear and convincing evidence," nor can we hold that the trial court's decision was objectively unreasonable in light of the evidence presented in the state-court proceeding.

## VI

For these reasons, we AFFIRM.