**REVISED March 14, 2018**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-70018

United States Court of Appeals
Fifth Circuit
**FILED**
February 22, 2018
Lyle W. Cayce
Clerk

JOHN WILLIAM KING,

Petitioner - Appellant

v.

LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeal from the United States District Court
for the Eastern District of Texas

Before KING, SOUTHWICK, and HAYNES, Circuit Judges.

KING, Circuit Judge:

John William King was convicted and sentenced to death by a Texas jury for the capital murder of James Byrd. After his direct appeal and state habeas applications failed, King sought federal habeas relief. The district court denied King's petition. This court then granted a certificate of appealability on one claim: that King's trial counsel was constitutionally ineffective in presenting the case for King's innocence. We agree with the district court that this claim fails on its merits, and thus we AFFIRM.

No. 16-70018

## I.

This case concerns a high-profile murder in the small town of Jasper, Texas. Early Sunday morning, June 7, 1998, Jasper police discovered the dismembered body of James Byrd, a black man. His torso, legs, and left arm were found on Huff Creek Road in front of a church. The rest of Byrd was found a mile and a half up the road. A forensic pathologist would later testify that Byrd's injuries—cuts and scrapes around his ankles and abrasions covering most of his body—were consistent with having his ankles wrapped together with a chain and being dragged by a vehicle. Byrd's death and dismemberment were caused, according to the pathologist, when he was slung into a culvert on the side of the road.

From Byrd's remains, police followed a blood trail up a logging road. The trail ended at a grassy area where a fight appeared to have occurred. At the grassy area, police found a variety of items, including a cigarette lighter engraved with the words "KKK" and "Possum," three cigarette butts, a can of "fix-a-flat," a CD, a pack of Marlboros, beer bottles, a button from Byrd's shirt, Byrd's baseball cap, and a wrench inscribed with the name "Berry."

Police asked around Jasper to see if anyone saw Byrd on the night he was killed. A lifelong acquaintance of Byrd said he saw Byrd at a party on Saturday night, June 6. Byrd had left the party around 1:30 or 2:00 in the morning, walking alone towards his home. Another acquaintance drove past Byrd, who was walking down the road away from the party. At around 2:30 a.m., after the acquaintance had made it home, he saw Byrd pass, riding in the back of a primer-gray pickup truck. Three white men were in the cab of the truck.

On Monday, a day after Byrd's body was discovered, police stopped a primer-gray pickup for a traffic violation. Its driver was Shawn Berry. In the truck, police found a tool set which matched the wrench found at the grassy

2

No. 16-70018

area. Berry was arrested. Dried blood spatters under the truck and on one of the tires were discovered and then DNA tested. The DNA matched Byrd's. A substance consistent with fix-a-flat was found inside one of the truck's tires. In the truck's bed, police found a rust stain in a chain pattern.

Police searched Berry's apartment, which he shared with Lawrence Russell Brewer and John William King. They seized the roommates' drawings, writings, clothes, and footwear. Among the items seized were two pairs of "Rugged Outback" sandals, one size 9.5 and another size 10. The size-10 sandals were found in King's room, under his dresser, and next to his photo album. They were stained with Byrd's blood. An FBI forensic examiner, who compared the sandals to footprints at the grassy area, found that either the size-9.5 or -10 sandals could have created some of the prints. Another FBI agent took foot measurements of various suspects. King's feet were size 9.5, Shawn Berry's were 9, Brewer's were 7, and Lewis Berry's, Shawn Berry's brother who stayed sometimes at the apartment, were 10.

The three cigarette butts found in the grassy area were DNA tested. DNA from one butt revealed King as a major contributor, excluded Shawn Berry and Brewer as contributors, and did not exclude Byrd as a minor contributor. A minor contributor, an FBI investigator would explain at trial, deposits a small amount of DNA—say, by taking a single drag off a cigarette.

More physical evidence came to light linking King to the grassy area and the killing. The "Possum" lighter was King's (Possum was King's nickname in prison). Police also uncovered a 24-foot logging chain which matched the rust stains in the bed of Shawn Berry's truck. The chain was found in a covered hole in the woods behind the house of a mutual friend of the roommates. The mutual friend, Tommy Faulk, testified that on June 7, the day Byrd's body was found, King and Brewer showed up unannounced at Faulk's house. They came in Berry's truck. They parked on the side of Faulk's house facing the woods,

3

entered through the back door, stayed for a brief time, and then left.[1] The chain was found the next day in the woods behind Faulk's house.

King, Shawn Berry, and Brewer were charged with capital murder and separately tried. At King's trial, the State introduced all the previously mentioned physical evidence, as well as evidence showing King's violent hatred of black people. During his first stint in prison (which ended about a year before Byrd was killed), King was the "exalted cyclops" of the Confederate Knights of America (CKA), a white-supremacist gang. King's drawings displayed scenes of racial lynching. Several witnesses testified that King would not go to a black person's house and would leave a party if a black person showed up. King also had several prison tattoos. Among them were a burning cross, a Confederate battle flag, "SS" lightning bolts, a figure in a Ku Klux Klan robe, "KKK," a swastika, "Aryan Pride," and a black man hanging by a noose from a tree.

The State also put on evidence of King's larger ambitions. The State introduced King's writings, which indicated that King wished to start a CKA chapter in Jasper. The writings also indicated that King was planning for something big on July 4 (a little less than a month after the killing occurred). In prison, King spoke with other inmates about his goal of starting a race war, and about initiating new members to his cause by having them kidnap and murder black people. He wrote a letter to a friend about his desire to make a name for himself when he got out of prison. A gang expert, who reviewed King's writings, said that King's use of persuasive language showed he sought to recruit others to his cause. The expert also testified that where Byrd's body was ultimately left—on a road in front of a church rather than in the

---

[1] To counter this, the defense elicited testimony that other people could access Faulk's property and argued in closing that there was no direct evidence that King placed the chain in the woods. The defense also established on cross-examination that no physical evidence was recovered from the chain linking it to Byrd's killing.

surrounding woods—demonstrated that the crime was meant to spread terror and gain credibility.

King did not testify at his trial. But his version of events was introduced by the State through a letter he sent from jail to the Dallas Morning News. In that letter, King professed his innocence. He explained that his Possum lighter had been misplaced a week or so before he was arrested. He also presented his account of the night, pinning the murder on Shawn Berry and implying that the murder was the result of a steroid deal gone wrong. He admitted that he, Shawn Berry, and Brewer were drinking and driving around in Berry's truck on the night of the killing, but explained that he and Brewer had told Berry to drop them off at the apartment. Heading home, Berry spotted Byrd walking on the side of the road. Berry and Byrd, according to King, knew each other from county jail, and Byrd had sold Berry steroids in the past. After a brief exchange, Byrd hopped in the truck behind the cab. Berry explained that Byrd would ride along because the two of them "had business to discuss later." The party took a detour to a grocery store before heading home. At the store, Berry asked Brewer for some cash "to replenish his juice, steroid supply." Brewer obliged him, and the group got back in the truck, this time with Berry and Byrd up front so that they could chat about the deal, and Brewer and King in the back. Berry dropped Brewer and King off at the apartment and then left with Byrd.

The State poked two holes in this story. First, the State adduced testimony from Lewis Berry and Keisha Atkins, King's friend, that contrary to King's story that he lost the Possum lighter a week before, he had the lighter on the night of the killing. Lewis Berry explained that King had lost his lighter, but that it had been returned to him before the night of the killing. Second, the State put on evidence that Brewer's shoe was stained with Byrd's blood, undermining King's claim that both he and Brewer were dropped off earlier.

5

No. 16-70018

The State also put on a note King had tried to smuggle to Brewer while both men sat in jail. A portion of the note reads as follows:

> As for the clothes they took from the apt. I do know that one pair of shoes they took were Shawn's dress boots with blood on them, as well as pants with blood on them. As far as the clothes I had on, I don't think any blood was on my pants or sweat shirt, but I think my sandals may have had some dark brown substance on the bottom of them.
>
> .   .   .
>
> Seriously, though, Bro, regardless of the outcome of this, we have made history and shall die proudly remembered if need be. . . . Much Aryan love, respect, and honor, my brother in arms. . . . Possum.

The State also introduced a wall scratching from King's cell: "Shawn Berry is a snitch ass traitor." King was aware at the time that Shawn Berry had spoken to police about the circumstances of Byrd's murder.

King's trial counsel,[2] C. Haden Cribbs and Brack Jones, gave no opening statement, cross-examined most State witnesses, and called three witnesses. The defense attacked the State's case in a few ways. The State needed to show that the murder occurred in the course of a kidnapping to prove the capital-murder charge, *see* Tex. Penal Code Ann. § 19.03(a)(2), so the defense attacked the kidnapping theory to save King from the death penalty.[3] The defense also

---

[2] King's first lawyer was replaced when the charges against King escalated from murder to capital murder.

[3] To show that Byrd was kidnapped, the State put on evidence of Byrd's consciousness while being dragged. According to the State's pathologist witness, the shape of Byrd's wounds indicated that Byrd had tried to relieve the pain by rolling and swapping one side of his body for another while being dragged. The lack of injuries to Byrd's head also indicated that he had tried protect his head while being dragged.

The defense attacked this theory along a number of lines. Counsel: (1) elicited testimony that Byrd was not resisting when in Berry's truck, (2) attacked the credibility of the pathologist who testified that Byrd was alive during the dragging, (3) closed by emphasizing that capital murder turns on whether Byrd was kidnapped, and (4) argued that

6

attacked the State's racial-motive theory by challenging the admission of evidence of King's racial animus and calling witnesses to testify that his racism was a method of self-preservation in prison. The defense put on evidence that King behaved normally following the murder. And the defense attacked the State's physical evidence, which we will return to later.

These arguments did not convince the jury, as King was convicted of capital murder and subsequently sentenced to death. Meanwhile, Berry got a life sentence, *see Berry v. State*, No. 09-00-061CR, 2001 WL 726273, at *1 (Tex. App.—Beaumont June 27, 2001, pet. ref'd), and Brewer was sentenced to death, *see Brewer v. Quarterman*, 466 F.3d 344, 345 (5th Cir. 2006).

After King was sentenced to death, he received a new lawyer for post-trial proceedings. That new lawyer moved for a new trial, raising an ineffective assistance claim. King swore in an attached affidavit that he told his trial counsel that he "had an alibi, that [he] had been dropped off in town and that there was an eyewitness to this, but [his] attorney failed to investigate this claim and failed to locate the eyewitness." King's motion was denied. King then attacked his sentence and conviction on direct appeal to the Texas Court of Criminal Appeals (TCCA), once again raising the argument that trial counsel failed him by not investigating his alibi. The TCCA rejected this claim and affirmed King's sentence and conviction. *See King v. State*, 29 S.W.3d 556, 558 (Tex. Crim. App. 2000).

While King's direct appeal was pending, he was appointed state habeas counsel. This new lawyer filed a state habeas application, claiming that King was denied effective assistance for two reasons relevant here. The application argued that trial counsel was ineffective in failing to properly investigate and

---

the chaining could not constitute kidnapping because the chaining was "the method of death," and not a separate act.

No. 16-70018

present an alibi defense and in failing to raise an insanity defense. In response to King's application, the State submitted an affidavit from Cribbs stating that he looked into the alibi but found nothing to support it. Cribbs also stated that his attempts to find evidence relevant to an insanity plea were rebuffed, as friends and family did not want to testify on King's behalf. Finding both claims meritless, the state habeas court recommended the denial of relief. The TCCA agreed and denied King's application without written order.

King moved on to federal court with a new lawyer and new evidence. He raised 21 claims for relief, including the one relevant to this appeal—his claim that he received ineffective assistance of trial counsel in presenting the case for his innocence (his "IATC-innocence claim"). The district court granted summary judgment for the State on several of King's claims, and stayed the case to give King time to exhaust his remaining claims with the state courts. King's return to state court was not fruitful. The TCCA dismissed his second application as an abuse of the writ, "without considering the merits of the claims." *Ex parte King*, No. WR-49,391-02, 2012 WL 3996836, at *1 (Tex. Crim. App. Sept. 12, 2012) (per curiam) (not designated for publication).

King came back to federal court and filed an amended petition. The district court denied King's motions for discovery and an evidentiary hearing, and eventually his whole petition. With respect to King's IATC-innocence claim, the court found it subject to a procedural bar, one that King failed to overcome under *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), or by showing actual innocence. Alternatively, the court found his claim meritless.

We granted King a certificate of appealability (COA) on his IATC-innocence claim, but qualified the grant in one respect. *King v. Davis*, 703 F. App'x 320, 331–32 (5th Cir. 2017) (per curiam). We noted that "to the extent that King is arguing in support of this claim that his trial counsel was

8

ineffective in searching for an alibi witness, we decline to issue a COA with respect to that aspect of the claim." *See id.* at 332 n.13. King presented this argument to the state courts, and they reasonably rejected it. *Id.* Accordingly, "this aspect of the claim" was undebatable and no COA issued with respect to it. *Id.*

## II.

This appeal presents several legal questions: Do the strictures of 28 U.S.C. § 2254(d) apply? May we consider King's new evidence under 28 U.S.C. § 2254(e)(2)? And may King excuse his procedural default through *Martinez* and *Trevino*?

For the reasons we lay out below, we cut to the core of the case—does King's IATC-innocence claim merit relief? We determine that it does not, even when reviewed de novo with King's new evidence and ignoring the procedural bar. *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) (holding that federal courts can "deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies"); *Bell v. Cone*, 543 U.S. 447, 451 & n.3 (2005) (declining to consider whether the court of appeals correctly held that the petitioner had not defaulted and citing § 2254(b)(2) for the proposition that a habeas application "may be denied on the merits, notwithstanding a petitioner's failure to exhaust in state court"). Thus, the district court did not err by denying King's petition.

## III.

Resolved to go directly to the merits, we begin with the governing standard. King's IATC-innocence claim is governed by the familiar *Strickland* standard. To prevail, King must show: (1) that his trial counsel rendered deficient performance, and (2) that the deficient performance resulted in actual prejudice. *See, e.g.*, *Rhoades v. Davis*, 852 F.3d 422, 431 (5th Cir. 2017) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

*Strickland*'s first prong "sets a high bar." *Buck v. Davis*, 137 S. Ct. 759, 775 (2017). "To demonstrate deficient performance, the defendant must show that, in light of the circumstances as they appeared at the time of the conduct, 'counsel's representation fell below an objective standard of reasonableness' as measured by 'prevailing professional norms.'" *Rhoades*, 852 F.3d at 431–32 (quoting *Strickland*, 466 U.S. at 687–88). We must apply a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 689). This requires us to "affirmatively entertain the range of possible 'reasons . . . counsel may have had for proceeding as they did.'" *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011).

To satisfy *Strickland*'s second prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693).

King's complaints with his trial counsel run the gamut; we categorize them by genre for the sake of simplicity. King's main attacks concern counsel's treatment of several major facets of the State's case: (1) the DNA evidence on the cigarette butts, (2) the size-10 sandals with Byrd's blood on them, (3) the note to Brewer, and (4) the racial-motive theory.

We review and then reject each of these arguments. Considering that counsel was "[f]acing an uphill battle from the start," counsel acted reasonably and "maximize[d] [King's] chances of acquittal." *See Atkins v. Zenk*, 667 F.3d 939, 946 (7th Cir. 2012). We review "the district court's findings of fact for clear

No. 16-70018

error and its conclusions of law de novo." *Dorsey v. Stephens*, 720 F.3d 309, 314 (5th Cir. 2013).

## A.

Recall that a key piece of evidence placing King at the grassy area was his DNA from a cigarette butt recovered at the scene. King argues that counsel let the State mischaracterize the DNA test results. During summation, the State characterized the butt as having DNA "consistent with Byrd," even though the evidence only showed that Byrd could not be excluded as a minor contributor. Not only did counsel fail to object to this line of argument, counsel further compounded the mischaracterization, according to King. When counsel turned to the butt during summation, he noted that this was the "one that somebody else took a drag off." He also explained that Byrd could have pulled the butt from the truck's ashtray and "took a puff" off of it. Per King, this created the impression that Byrd's DNA was really on the butt, even though the DNA evidence was inconclusive.

We conclude that the defense reasonably handled the DNA evidence. The defense's decision to lean into the State's characterization appears to be a reasonable move by a side lacking better options. Viewed in isolation, leaning into the State's characterization may appear to be a step back for King. It supported the inference that King and Byrd smoked the same cigarette. But viewed "in full context," the strategic reasoning behind this decision becomes clear. *See Dowthitt v. Johnson*, 230 F.3d 733, 751 (5th Cir. 2000). Far more incriminating than the implication that King and Byrd smoked the same cigarette was the fact that King's DNA was on a cigarette found at the grassy area. The defense needed to explain how the cigarette got there without King. It attempted to do that by implying that the following sequence occurred: King smoked the cigarette and put it in the ashtray; later on, after King had left the truck, Byrd picked up the cigarette, lit it, took a puff, and tossed it while at the

No. 16-70018

grassy area. To support this theory, King's counsel asked a witness familiar with King and his roommates where they would put their butts when they smoked in the truck,[4] attempted to establish that DNA on butts can last a long time when stored in an ashtray, and pointed out in summation that "[i]f [King] is such a severe racist, he's not going to share a cigarette with a black man."

King suggests a different course was available: counsel could have argued that the ashtray spilled out during a fight in the truck. But this theory has a key weakness: testimony at trial established that the ashtray was still in the truck. And finally, while King may have preferred his counsel to have emphasized this theory over the pick-up, puff, and toss theory, his "desire to have a specific defense theory presented does not amount to ineffective assistance." *See Coble v. Quarterman*, 496 F.3d 430, 437 (5th Cir. 2007).

**B.**

King next argues that counsel failed him by not forcefully arguing that the bloodstained size-10 sandals were Lewis Berry's. Two pairs of "Rugged Outback" sandals, size 9.5 and size 10, were recovered from King's apartment, and that the size-10 ones had Byrd's blood on them. Lewis Berry testified at trial that the size-10 sandals were King's. Lewis Berry also testified he wore a size 10.5 or 11 and that the only sandals he owned were the ones he brought to trial, and not the size-10 ones recovered at the apartment. But an FBI agent who took foot measurements found that Lewis Berry's feet were size 10 and

---

[4] King counters this by arguing that this attempt was unsuccessful; the witness did not know where the roommates put their butts. This is beside the point. The question itself shows that the defense was actively trying to explain the cigarette's presence at the grassy area. Even though counsel failed in this instance to draw out a favorable answer, the question itself indicates that the defense was acting strategically and attempting to open a path to victory. And either way, no prejudice arose from the question. The witness's response that she did not know where the roommates would put their butts did not hurt King.

King's were 9.5. Based on this, King points out that a key piece of evidence, the size-10 sandals, actually fit Lewis better.

Despite having this strong case inculpating Lewis and exonerating King, the defense fumbled, according to King. The defense did not accuse Lewis of lying on the stand when he said King owned the sandals. And King argues that his counsel blundered by not directly attacking Lewis's claim that he wore a size 10.5 or 11 by expressly referring to the foot-measuring FBI agent's testimony. All the defense did, per King, was "guarantee" during summation that Lewis was not size 11; counsel did not expressly connect the dots during summation or call back the FBI agent to directly impeach Lewis.[5]

We conclude that the defense's treatment of the sandals was reasonable. Counsel did several things to shift the blame to Lewis. Counsel got the foot-measuring FBI agent to admit during cross-examination that Lewis's feet were size 10 and King's were size 9.5. That same FBI agent admitted that Lewis had access to King's apartment—he "lived in the apartment at one time." And counsel elicited from the FBI agent that Lewis's fingerprints were on the CD from the grassy area. This cross-examination alerted the jury to the evidence implicating Lewis. King now believes that a more forceful and direct presentation of his case was possible. But given that counsel got out all the evidence of Lewis's guilt, we will not second-guess counsel's methods. *See Richter*, 562 U.S. at 105. Indeed, while a direct approach may be the right one

---

[5] To supplement his argument, King argues that his counsel unreasonably failed to call a witness. He argues that a person familiar with the roommates and Lewis Berry could have testified that Lewis wore similar sandals to the other roommates and that King usually wore sneakers.

This testimony would only be mildly beneficial to King, and therefore his counsel was not unreasonable in failing to present it. *See Richter*, 562 U.S. at 107 ("Counsel was entitled . . . to balance limited resources in accord with effective trial tactics and strategies."). It was already established at trial that Lewis owned a pair of sandals—he brought them to the trial. And the fact that King usually wore sneakers would do little to establish that he was not wearing sandals on the night of the killing.

in some circumstances, "it sometimes is better" for counsel "to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates." *See id.* at 109. And even if it could be shown that a less subtle approach would be better, counsel's performance need not be optimal to be reasonable. *See id.* at 104. King was entitled to "reasonable competence, not perfect advocacy." *See Yarborough v. Gentry*, 540 U.S. 1, 8 (2003).

And given key problems with the theory that Lewis was the sandal wearer, the decision not to press the point forcefully was not unreasonable or prejudicial. Substantial evidence indicated the size-10 sandals were King's—they were in his room, under his dresser, and next to his property. Further, a satisfying correspondence exists between the discovered sandals' sizes (9.5 and 10) and Shawn Berry's and King's sizes (9 and 9.5). The State also put on evidence that Lewis was not involved in the murder. Lewis had no criminal record, the police investigated him and eliminated him as a suspect, his DNA did not match any DNA at the crime scene, he had a corroborated alibi (he said he was at Tommy Faulk's house), and, at trial, he point blank denied murdering Byrd. Pressing the weak theory that Lewis was the sandal wearer could distract "from more important duties." *See Richter*, 562 U.S. at 107 (quoting *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009) (per curiam)). It also could have harmed counsel's credibility with the jury, credibility that could later save King's life. *See Florida v. Nixon*, 543 U.S. 175, 191–92 (2004); *United States v. Cronic*, 466 U.S. 648, 656 n.19 (1984). In sum, the defense presented a reasonable attack on the sandal evidence, and its failure to be more direct, go more in-depth, or land perfect blows does not mean King received constitutionally deficient assistance.

## C.

King's next complaint concerns his counsel's treatment of his note to Brewer. King wrote a note to Brewer while both men sat in jail which stated,

in relevant part: "As far as the clothes I had on, I don't think any blood was on my pants or sweat shirt, but I think my sandals may have had some dark brown substance on the bottom of them." The note went on to state, "regardless of the outcome of this, we have made history and shall die proudly remembered if need be."

King contends that with proper handling, the note could be spun as non-incriminating. According to King, his note was merely repeating what his first lawyer had told him about the State's evidence. If called, his first lawyer would be able to testify that he told King that the State had a sandal with Byrd's blood on it that was allegedly his. This, according to King, would rebut the State's contention that the note was an admission of guilt.

We find the defense's decision not to draw more attention to this note to be eminently reasonable. We must presume that counsel avoided the note "for tactical reasons rather than through sheer neglect," *see Pinholster*, 563 U.S. at 191 (quoting *Gentry*, 540 U.S. at 8), and there was a very strong reason to avoid touching the note. King does not explain how counsel could have spun the line about how he thought Brewer and him had "made history." Further, the spin King wishes counsel put on the note is ultimately lackluster. The original lawyer's testimony could raise an inference that King was just repeating what he had heard, but creating this inference was not worth the risk. Accordingly, counsel reasonably avoided a strategy that "might be harmful to the defense." *See Richter*, 562 U.S. at 108 (citing *Strickland*, 466 U.S. at 691). Finally, King's complaint faces a very specific problem: his first lawyer's affidavit does not state that he would have testified on King's behalf if called. To make out a claim that counsel should have called a witness, King must, at a minimum, present some evidence that the witness would have testified if called. *See Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985).

**D.**

Turning away from the physical evidence, King argues that counsel blundered by ineffectively attacking the State's claimed motive for the murder—that King hated black people and believed the killing would increase the CKA's profile. King argues that effective counsel could rebut this motive. He isolates several acts and omissions by counsel that he submits were unreasonable.

King first contends that counsel should have called the inmate who created most of his tattoos to testify that the tattoos did not display King's racial motivations. This inmate swore in an affidavit that the tattoos had nothing to do with racism. According the inmate, King did not even know he was going add the scene of the black man hanging from a tree, which was just "filler" material for a larger image. In a similar vein, King argues that trial counsel should have gotten King's ex-girlfriend to testify that "[t]here were no racial overtones to the tattoos."

King next attacks counsel's "disjointed" summation. King submits that counsel could have explained King's racial worldview in a way that would convince the jury that he would not perform random acts of brutality. Instead, according to King, counsel failed to present a coherent case.

Lastly, King argues that counsel failed to present evidence showing that he was planning to move from Jasper to Georgia. Introducing this evidence would defeat the State's theory that the murder was part of a strategy to raise the profile of the local CKA chapter. King's plan to move could be supported by two different types of evidence: King's probation-transfer requests from Texas to Georgia, the last one being dated March 2, 1998, and testimony from King's natural father, Samuel Rae, saying that King expressed a desire to move to Georgia.

No. 16-70018

We consider and reject each of these arguments. At the outset, King's complaints face an uphill battle because his counsel did put on a substantial defense to the racial-motive theory. The defense first tried to keep King's tattoos and writings out based on their unfairly prejudicial nature. When that failed, the defense switched to arguing that King's tattoos and racial attitudes were part of a self-preservation strategy developed in prison. To do this, the defense put on several witnesses. One witness, who knew King before he went to prison for the first time, testified that King's white-supremacist views bloomed in prison. Another witness, who had dated King, testified that King had not espoused racist ideas before he went to prison. A witness, who knew King personally, testified that King never attempted to recruit him for a racist organization. Finally, a witness testified that King did not target minorities with violence upon his release from prison. King now wishes his counsel did more to establish that he lacked a racial motive. But his complaints "essentially come[ ] down to a matter of degrees," a type of grievance which is particularly unsusceptible "to judicial second-guessing." *See Dowthitt*, 230 F.3d at 743.

We are also convinced that even if counsel could have done more to undermine the racial-motive theory, no prejudice arose from failing to do so. The State's case that King harbored violent white-supremacist views was multifaceted and ironclad. King was part of a white-supremacist prison gang; he wrote about his desire to expand that gang; he spoke to others about using racial violence as an initiation ritual; he had a lighter that said KKK on it; and he drew pictures of racial lynching. No matter how skillful they were, counsel could not make this evidence go away.

Turning to whether counsel blundered by not calling the inmate and King's ex-girlfriend, both omissions were reasonable and non-prejudicial. Generally, complaints that trial counsel failed to call a witness are "not favored

17

because the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain." *See Alexander*, 775 F.2d at 602 (citing *United States v. Cockrell*, 720 F.2d 1423, 1427 (5th Cir. 1983)). "The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." *Grossman v. McDonough*, 466 F.3d 1325, 1347 (11th Cir. 2006) (quoting *Waters v. Thomas*, 46 F.3d 1506, 1513–14 (11th Cir. 1995)). "To prevail on an ineffective assistance claim based upon uncalled witnesses, an applicant must name the witness, demonstrate that the witness would have testified, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable." *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010) (citing *Alexander*, 775 F.2d at 602).[6]

In this case, the defense had good reason for not calling either witness. It strains credulity to think that the jury could be convinced that King's tattoo collection, which includes numerous symbols associated with white supremacy and an image of a black man hanging from a tree, were not racist. Further, a jury would be hard pressed to believe that the tattoos were somehow free of racial animus given the other evidence of King's racist beliefs. And even if the image of the black man hanging was just "filler," King later became aware of it and, according to one witness, was proud of it. King also clearly knew what it was—he described his tattoo to a teenager as his "little n[****]r man hanging from a tree." Further, the argument that the tattoos were not racist in any way would fly in the face of King's other argument, which was that the tattoos were indeed racist but only a show he needed to put on to survive prison. In sum, by not calling either witness, the defense reasonably avoided distracting the jury

---

[6] King's assertion that counsel should have called more unidentified witnesses to rebut the racial-motive theory fails given this standard. At this stage, King needed to at least "name the witness[es]" and "set out the content of" their testimony. *See Gregory*, 601 F.3d at 352.

and overtaxing its credibility. *See Richter*, 562 U.S. at 107; *Nixon*, 543 U.S. at 191–92; *Cronic*, 466 U.S. at 656 n.19.

Turning next to King's argument that counsel should have performed better during summation, we can discern no constitutional violation. Admittedly, counsel's summation was at times difficult to follow; he certainly appears to have stumbled in places. But a few garbled lines in summation do not rise to the level of a constitutional violation. Indeed, we have warned against "selectively extracting phrases from trial counsel's closing argument." *See Dowthitt*, 230 F.3d at 751. Our review of counsel's conduct at summation is "highly deferential" given "the broad range of legitimate defense strateg[ies] at that stage." *See Gentry*, 540 U.S. at 6. Here, the defense emphasized the State's burden of proof; it attacked the notion that any physical evidence connected King to the scene of the crime; it attacked the State's theory of kidnapping, which was necessary to establish the capital-murder charge; it explained that simply being a racist did not mean King was capable of such a brutal murder; it argued that King's racial views were a product of his prison environment and they subsided when he got out; it argued the size-10 sandals with Byrd's blood on them could have been worn by Lewis Berry; and it argued that King should not be judged by his appearance but by his conduct. When "viewed as a whole," counsel's summation, which advanced a few of King's best points, was reasonable. *See Atkins*, 667 F.3d at 945 (emphasis removed).

Finally, it was reasonable for counsel to omit any mention of King's plans to move to Georgia. The evidence supporting that he had a plan at the time of the killing was fairly weak, went to only one component of the State's racial-motive theory, and, even if believed by the jury, would only nibble at the edges of the State's case. The most recent transfer request was dated three months before the killing, and Rae's affidavit does not specify when the move was to occur or when King expressed his desire to move. Moreover, Rae would not

No. 16-70018

have testified if called, defeating any claim that counsel was ineffective in failing to call Rae. *See Gregory*, 601 F.3d at 352. Cribbs, one of King's trial lawyers, swore that King's family members, including Rae, told him that they would not testify on King's behalf.[7]

To sum up, the defense reasonably handled the State's evidence of King's racial motive, and any potential errors were not prejudicial.

**E.**

We now turn to King's arguments which do not fit neatly within any of the categories we listed above. We briefly consider and reject these miscellaneous arguments.

King argues that his trial counsel erred by not supporting his story in his letter to the Dallas Morning News: that Berry alone killed Byrd during a steroids deal gone wrong. He argues that the defense should have introduced Byrd's criminal history, which included cocaine and marijuana offenses. King argues that the media-rights deal he entered into with his trial lawyers explains why they did not pursue the steroid-deal-gone-wrong theory. Stories about racial lynching sell; stories about drug-related murders do not. His trial lawyers maximized the value of their bargain by letting the case remain about a race crime.

---

[7] King's rejoinder is that Cribbs lied. He points to the affidavits of three of his family members, two of whom swear that Cribbs never contacted them. The last, Rae, swore that he spoke to Cribbs, told him he would be willing to testify at trial, told him that King had expressed interest in moving to Georgia, but never heard back. Based on the findings of the state courts, we cannot conclude that Cribbs lied. The state habeas court accepted Cribbs's affidavit as true, based on its finding that Cribbs was "a credible witness." We note that the same judge who ruled on King's state habeas application also presided over King's trial, and thus personally witnessed Cribbs's presentation and demeanor. This finding is entitled to a presumption of correctness, and may only be rebutted by "clear and convincing evidence." *See* 28 U.S.C. § 2254(e)(1). The affidavits now contradicting Cribbs do not rise to the level of clear and convincing evidence: they were created over a decade after trial and supply little but bare assertions.

No. 16-70018

Contra King, the defense's failure to put on the steroid-deal-gone-bad theory was reasonable and non-prejudicial. In short, very little supports the theory. King's letter to the Dallas Morning News contained at least two falsehoods, one of which King now concedes (whether the Possum lighter was lost on the night of the murder).[8] Byrd's drug arrests were for cocaine and marijuana offenses, not for steroids. Thus, introducing Byrd's convictions for marijuana and cocaine offenses would do little to aid the steroids theory, but it may have made the defense look cruel or distract the jury's attention from more important issues. *See Richter*, 562 U.S. at 108. Moreover, the theory is uncorroborated by any physical evidence (say finding steroids, needles, or money) and appears inconsistent with the brutality of the murder and disregard the killers had for covering their tracks.

King's arguments about the media-rights deal's effect on his lawyers' motivations is also unconvincing. By itself, a media-rights deal does not establish ineffectiveness of counsel. *See Beets v. Scott*, 65 F.3d 1258, 1260 (5th Cir. 1995) (en banc). And while we disapprove of such deals, we are hesitant to find prejudice from them absent a showing of "actual influence of the media rights contract on the conduct of [the] defense"—that is, a showing that counsel

---

[8] King also argues that the defense missed an opportunity to boost the credibility of his letter. He argues that the defense should have called two witnesses that could testify that they discovered damaged mailboxes and stop signs after the night of the killing. King argues that if these witnesses were called, their testimony would have verified the part of King's letter where he admitted to knocking down mailboxes and stop signs.

This argument faces the same problem as King's argument based on Rae's affidavit—despite what the two affiants now say about their willingness to testify, at the time of trial when Cribbs attempted to gain their cooperation, they refused. Because King cannot show that either would testify if called, he cannot establish prejudice. *See Alexander*, 775 F.2d at 602. Further, the proffered testimony barely helps King's case. The State did not try to show that the mailboxes were still standing to undermine the letter's credibility. Rather, its attack went to the letter's exculpatory parts. Finally, given how small the benefit from this evidence would be, counsel could reasonably conclude that it was not worth putting it on given the harm that may arise from reminding the jury that King was out destroying mailboxes on the night Byrd was killed. *See Richter*, 562 U.S. at 108.

"manipulated the case to enhance publicity or that the contract generally clouded [counsel's] good judgment." *See id.* at 1274 (footnote omitted). Here, King can show potential motive but no follow through. To the extent King argues that the deal gave counsel an incentive not to seek evidence harmful to the racial-motive theory, King has failed to "allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *See Gregory*, 601 F.3d at 352 (quoting *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989)).

King next argues that his counsel erred by not giving an opening statement. This argument is unavailing. Courts routinely hold that waiver of opening statement is not unreasonable, given the presumption of competence afforded counsel. *See, e.g.*, *Malicoat v. Mullin*, 426 F.3d 1241, 1260–61 (10th Cir. 2005); *United States v. Rodriguez-Ramirez*, 777 F.2d 454, 458 (9th Cir. 1985) ("The timing of an opening statement, and even the decision whether to make one at all, is ordinarily a mere matter of trial tactics and in such cases will not constitute the incompetence basis for a claim of ineffective assistance of counsel."). King cites no unique circumstances that could lead us to depart from this general rule, and therefore we do not.[9]

---

[9] The State now submits extra-record evidence of Cribbs's status as a premier Texas defense attorney. The State argues that Cribbs's competence at King's trial can be inferred from his reputation. *See Burger v. Kemp*, 483 U.S. 776, 779–80 (1987).

King takes issue with this evidence. He argues that the basic theory of appellate review forecloses consideration of evidence not passed upon below.

We agree with King. Cribbs's reputation was not previously introduced. It would unfairly disadvantage King if we considered it, as King now has "no opportunity" to offer rebuttal evidence. *See Singleton v. Wulff*, 428 U.S. 106, 119 (1976).

But this cuts both ways: King also has evidence that was not passed upon below. He submits a passage from a book to show that his counsel's failure to give an opening statement started things off on the wrong foot and devastated his credibility. From this same book, he submits passages to show that his trial counsel blundered by failing to call an "attractive black woman" to testify that King "was nice and showed no reaction to her race while she was at his apartment." For the same reason we disregard the State's evidence, we disregard King's.

No. 16-70018

Next, King offers his response to a civil suit brought by Byrd's family to show that there were additional unpursued avenues for investigation. In his response to the civil lawsuit, King alleged that his branch of the CKA was strictly a prison gang and that the CKA's parent organization emphasizes nonviolence. But King submits nothing but his prior pleadings to support these assertions. Because King has not supplied us with the specific evidence that further investigation could have revealed, he cannot make out a claim. *See Gregory*, 601 F.3d at 352 (quoting *Green*, 882 F.2d at 1003).

King also offers a written statement by Brewer, his self-labeled "Coup de Grace," where Brewer swears that King was not involved in the killing. The statement claims that King was dropped off earlier in the night and that Brewer, Shawn Berry, and Lewis Berry killed Byrd. But King admits that under the circumstances, Brewer could not have been called to testify at King's trial. Accordingly, counsel could not be deficient for failing to call Brewer. *See id.* If instead Brewer's statement is offered to show prejudice, we agree wholly with the district court that this evidence is entitled to little weight. The statement is of questionable credibility given that it was prepared five years after Byrd's death and four years after Brewer's conviction. *See Komolafe v. Quarterman*, 246 F. App'x 270, 272 (5th Cir. 2007) (per curiam) (finding an affidavit's credibility mitigated because it was submitted eight years after the petitioner's conviction). Further diminishing its credibility, the statement is internally inconsistent and conflicts with King's story from his letter to the Dallas Morning News, which does not mention Lewis Berry's involvement and states that both he and Brewer were dropped off before the killing occurred. And given that Berry's statement exonerating King came at a time when Brewer "had nothing whatsoever to lose by incriminating himself," we are hesitant to put much weight on it. *See Drew v. Scott*, 28 F.3d 460, 463 (5th Cir. 1994).

23

No. 16-70018

Finally, King argues that counsel erred by not eliciting from Keisha Atkins that, on the night of the murder, any of the roommates could have accessed his Possum lighter. In an affidavit, Atkins swears that she would have testified if asked that the lighter was readily available to anyone in the apartment who wanted to pick it up on the night of Byrd's death. This argument is unavailing for three reasons. First, adducing this testimony would have directly contradicted King's letter to the Dallas Morning News, where he wrote that he had lost his lighter a week earlier; counsel could reasonably decide to avoid a path harmful to other parts of King's case. *See Richter*, 562 U.S. at 108. Second, counsel's failure to adduce one piece of testimony related to one piece of evidence does not render his whole performance unreasonable. *See id.* at 104; *Gentry*, 540 U.S. at 8. Finally, the failure was non-prejudicial given that stronger evidence existed that King was at the scene (namely, his DNA on the cigarette butt).

## F.

We conclude by holding that even if we were to conclude that counsel's performance was unreasonable (which we do not), the errors King isolates do not establish *Strickland* prejudice. King does not show that the strongest evidence against him could be mitigated or explained away by competent counsel.[10] To recap some of the most potent evidence, King's DNA was on a cigarette butt found at the grassy area. King's jail note to Brewer, who later admitted to the killing, stated that they "ha[d] made history." King was a

---

[10] To show prejudice, King argues that the State admitted that the evidence against him was weak. In reality, the State argued below that King's trial counsel honed in on the weakest parts of the State's case. This is a far cry from an admission that the whole case was weak. Also, King hardly benefits from this argument. While it presumably aids King's case for prejudice (the weaker the State's case, the higher the chance of a different result), it simultaneously harms King's case for unreasonable performance (the State's argument shows that counsel acted strategically and went after the weak spots in the State's case).

member of a white-supremacist gang, who wanted to recruit others to his cause, and had spoken openly about kidnapping and murdering a black person as a symbolic act. "[T]he jury, cognizant of [this] overwhelming evidence of guilt, would have found [King] guilty even if" the errors King unsuccessfully alleges here had been rectified. *See Pondexter v. Quarterman,* 537 F.3d 511, 524 (5th Cir. 2008). This leads us to conclude that correcting all the errors King alleges would not have produced a "reasonable probability" of a different result. *See Strickland,* 466 U.S. at 694.

## IV.

For the foregoing reasons, we AFFIRM the judgment of the district court.