# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-70006

United States Court of Appeals
Fifth Circuit

**FILED**

April 10, 2015

Lyle W. Cayce
Clerk

RAMIRO F. GONZALES,

Petitioner - Appellant

v.

WILLIAM STEPHENS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:10-CV-165

Before HIGGINBOTHAM, DENNIS, and GRAVES, Circuit Judges.

PER CURIAM:*

Ramiro Gonzales seeks a certificate of appealability ("COA") to appeal
the district court's denial of his federal habeas corpus petition, filed pursuant
to 28 U.S.C. § 2254, challenging his state criminal conviction for capital murder
and sentence of death.  For the reasons that follow, we DENY his request.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH
CIR. R. 47.5.4.

No. 14-70006

## BACKGROUND

The facts surrounding Gonzales's underlying crime are not in dispute. On January 15, 2001, Gonzales went to the home of his drug supplier, hoping to steal cocaine. Only his supplier's girlfriend, Bridget Townsend, was at the home, so he tied her up and stole what cash he could find, but did not find any drugs. He then carried the bound Townsend to his pickup truck, drove her out to the large ranch on which he lived, retrieved a hunting rifle, and marched Townsend out into the deserted brush. When he started loading the rifle, Townsend told Gonzales that she would give him money, drugs, or sex if he would spare her life. In response, Gonzales unloaded the rifle and took Townsend back to his truck, where he had sex with her. After she dressed, he reloaded the rifle, walked her back into the brush, and shot her. He left her body where it fell. Gonzales eventually confessed to his crimes.

At trial, a jury found Gonzales guilty of capital murder as charged. During the punishment phase, the prosecution called various witnesses in an effort to show that Gonzales did not feel remorse for his crime, had a history of bad conduct, did not suffer from mental illnesses, and would likely continue to be violent in prison. Among other witnesses, the prosecution called a woman whom Gonzales had abducted at knifepoint, brutally raped, and locked in a closet on the same ranch where he had earlier killed Townsend. It was while he was in custody for those crimes that Gonzales confessed to having murdered Townsend. The prosecution also called Dr. Edward Gripon, a forensic psychiatrist, who testified that there was a serious risk Gonzales would continue to commit acts of violence in the prison setting. Dr. Gripon acknowledged that predictions of future dangerousness were highly controversial and that the American Psychiatric Association had taken the position that such predictions are unscientific and unreliable, but maintained

2

that forensic psychiatrists as a whole believed that they were qualified to make such predictions.

The defense called a number of witnesses during the punishment phase as well, focusing primarily on Gonzales's family history and upbringing. Various witnesses testified that Gonzales was effectively abandoned by his mother and was left on a large ranch to be raised by his maternal grandparents, who often provided inadequate or no supervision throughout his childhood. Several of Gonzales's relatives testified that Gonzales's mother frequently drank alcohol, huffed spray paint, and abused drugs throughout her pregnancy and twice attempted to abort Gonzales. Numerous witnesses also detailed the physical and sexual abuse that Gonzales suffered throughout his childhood, including being kicked by his mother's boyfriend, being sexually abused by an older male cousin, and having a sexual relationship with an eighteen-year-old woman when he was twelve or fourteen years old.

The defense also called Dr. Daneen Milam, a neuropsychologist and sex offender treatment provider, to testify as to Gonzales's mental health. Dr. Milam explained that she had conducted a ten-hour neuropsychological examination of Gonzales; reviewed "literally stacks of records," including school records, probation records, and incident reports; went to the ranch on which Gonzales grew up, where she spoke with his grandparents, his cousin, and the ranch manager; and reviewed all of the interviews conducted by the defense team's mitigation investigator. Dr. Milam testified that from her evaluation, she found no evidence of brain damage, "none whatsoever." She said that Gonzales's IQ and brain were within normal limits, in spite of all of his and his mother's drug use. Dr. Milam stated that educational records indicated Gonzales was developmentally delayed but that he started off with a normal brain. She opined that Gonzales "basically raised himself," which led him to have the emotional maturity of someone who is thirteen or fourteen

years old. Dr. Milam also testified that some of the tests she attempted to conduct on Gonzales were invalid because he clearly tried to come across as mentally ill. She was able to conclude, however, that while Gonzales exhibited some schizotypal and antisocial personality features, his primary diagnosis was "reactive attachment disorder." Dr. Milam explained that reactive attachment disorder is due entirely to environmental factors wherein a young child was not able to form a stable, emotional bond with any adult and leads to being immature, insecure, solitary, and manipulative later in life. Dr. Milam next discussed Gonzales's mother's drug use while pregnant with Gonzales and the abuse Gonzales suffered as a child. Dr. Milam testified that Gonzales was probably in the top 10% of emotionally damaged children and now likely could be diagnosed with antisocial personality disorder, but stated that Gonzales was not mentally ill, had a normal IQ, and was not mentally retarded.

In their closing argument during the punishment phase, defense counsel focused on the evidence that Gonzales essentially raised himself; was exposed to alcohol, marijuana, and paint fumes in utero; was sexually abused by a cousin starting at the age of four or six; started drinking and doing drugs at eleven; was sexually abused by an older woman at twelve or thirteen; and was sentenced to life in prison at just eighteen[1]. In its rebuttal argument, the prosecution referenced Dr. Gripon's testimony as to future dangerousness and suggested that Gonzales's mother's use of drugs while pregnant with Gonzales was meaningless because there was no evidence that it affected him.

---

[1] After murdering Townsend but before being charged with the murder, Gonzales kidnapped and raped another woman. He was sentenced to life in prison for his crimes against the second woman and confessed to having murdered Townsend while he was serving that sentence.

No. 14-70006

The jury unanimously made the findings required for capital punishment in Texas, and the judge entered a sentence of death.  On direct appeal, Gonzales argued that the prosecution's expert should not have been permitted to give an opinion as to future dangerousness.  Gonzales did not argue that trial counsel should have called more expert witnesses.  The Texas Court of Criminal Appeals ("CCA") affirmed the conviction and sentence, *Gonzales v. State*, No. AP-75540, 2009 WL 1684699, at *1-3 (Tex. Crim. App. June 17, 2009), and the United States Supreme Court denied certiorari, *Gonzales v. Texas*, 559 U.S. 942 (2010).

In his first state habeas corpus application, Gonzales filed an eight-page petition raising four claims, none of which is now before this Court.  The CCA denied relief.  *Ex parte Gonzales*, No. WR-70969-01, 2009 WL 3042409, at *1 (Tex. Crim. App. Sept. 23, 2009).  Gonzales next filed a federal habeas petition, but soon obtained a stay and abeyance so that he might first exhaust additional claims in state court.  In his second state habeas petition, Gonzales raised six issues, including that his trial counsel were ineffective for failing to obtain experts to present mitigating evidence that Gonzales suffered from Fetal Alcohol Spectrum Disorder ("FASD") and the effects of "sexual, emotional, physical, and biological abuse," as well as that the trial court erred in allowing expert testimony as to Gonzales's future dangerousness.  The CCA dismissed the petition as an abuse of the writ and dismissed a motion for funding of expert assistance.  *Ex parte Gonzales*, No. WR-70969-01, 2012 WL 340407, at *1 (Tex. Crim. App. Feb. 1, 2012).

Gonzales then filed an amended federal habeas petition in district court, raising nine numbered claims.  The district court denied all claims and denied a COA.  The district court determined that Gonzales's ineffective assistance of counsel claims were procedurally defaulted, but also concluded that they would fail on the merits.

No. 14-70006

## STANDARD OF REVIEW

In a habeas corpus appeal, this Court "review[s] the district court's findings of fact for clear error and its conclusions of law *de novo*, applying the same standards to the state court's decision as did the district court." *Lewis v. Thaler*, 701 F.3d 783, 787 (5th Cir. 2012) (quoting *Busby v. Dretke*, 359 F.3d 708, 713 (5th Cir. 2004)). Gonzales is entitled to a COA if he makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). If the district court denies constitutional claims on the merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong" or "that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted). "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* "Each component . . . is part of a threshold inquiry, and a court may find that it can dispose of the application in a fair and prompt manner if it proceeds first to resolve the issue whose answer is more apparent from the record and arguments." *Id.* at 485. "[A]ny doubt as to whether a COA should issue in a death-penalty case must be resolved in favor of the petitioner." *Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir. 2005).

## DISCUSSION

### I.    Ineffective Assistance of Counsel

Gonzales argues that his trial counsel were ineffective for failing to obtain proper experts to present mitigation evidence of FASD and of sexual,

emotional, physical, and biological abuse.[2]   Gonzales raised his ineffective assistance of trial counsel claims for the first time in his second state habeas petition and the CCA denied them as an abuse of the writ under Article 11.071 of the Texas Code of Criminal Procedure.  We have consistently held that the Texas abuse-of-the-writ statute is a valid state-law procedural ground that forecloses federal habeas review where, as here, there is no indication that the CCA's order relied on federal law in dismissing the petition.  *See McGowen v. Thaler*, 675 F.3d 482, 499 (5th Cir. 2012); *Coleman v. Quarterman*, 456 F.3d 537, 542 (5th Cir. 2006).  Even so, the Supreme Court has held that "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective."  *Martinez v. Ryan*, 132 S. Ct. 1309, 1320 (2012).  The Supreme Court later made clear that this rule applies to habeas petitions stemming from Texas-court convictions.  *Trevino v. Thaler*, 133 S. Ct. 1911, 1921 (2013).

Applying *Martinez* in the COA context, this Court has said that "to succeed in establishing cause, the petitioner must show (1) that his claim of ineffective assistance of counsel at trial is substantial—i.e., has some merit— and (2) that habeas counsel was ineffective in failing to present those claims in his first state habeas proceeding."  *Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013) (citing *Martinez*, 132 S. Ct. at 1318).  As discussed below, Gonzales has failed to raise a substantial claim of ineffective assistance of trial counsel and therefore cannot show that his procedural default is excused.

---

[2] In his application for a COA before the district court, Gonzales also stated that he was denied effective assistance of trial counsel when his trial counsel provided the prosecution with unspecified "privileged work product."  This argument is not included in Gonzales's brief on appeal and is therefore abandoned.  *See United States v. Olano,* 507 U.S. 725, 731 (1993).

No. 14-70006

As set out in *Strickland v. Washington*, 466 U.S. 668 (1984), a petitioner establishes ineffective assistance of counsel if he can show that his counsel's performance was "deficient," meaning that counsel's "representation fell below an objective standard of reasonableness," and that counsel's "deficient performance prejudiced the defense." *Id.* at 687-88. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91. There is no strategic decision with respect to sentencing strategy, however, where counsel choose to abandon their investigation at an unreasonable juncture. *See Wiggins v. Smith*, 539 U.S. 510, 527-28 (2003). "In investigating potential mitigating evidence, counsel must either (1) undertake a reasonable investigation or (2) make an informed strategic decision that investigation is unnecessary." *Charles v. Stephens*, 736 F.3d 380, 389 (5th Cir. 2013) (per curiam). "[U]nder a *Strickland* analysis, trial counsel must not ignore pertinent avenues of investigation, or even a single, particularly promising investigation lead." *Id.* at 390 (internal quotation marks and citations omitted).

There is no evidence suggesting that Gonzales's trial counsel conducted less than a reasonable investigation. The record makes clear that Gonzales's trial counsel obtained the services of a mitigation specialist, an investigator, a neuropsychologist, and a prison expert. These experts and specialists conducted numerous interviews with Gonzales, his family members and acquaintances, performed psychological evaluations, and reviewed substantial records, such as school, probation, police, and jail records. The defense team conferred with each other and coordinated their findings. The evidence that Gonzales suffered emotional, physical, and sexual abuse, as well as that his

No. 14-70006

mother drank alcohol and used drugs while pregnant with him, was extensively presented to the jury by both lay and expert witnesses.

### 1.     FASD

As regards FASD specifically, defense counsel presented substantial evidence at trial that Gonzales's mother abused alcohol, marijuana, and inhalants while pregnant with Gonzales, which was known to trial counsel and Dr. Milam, the neuropsychologist that defense counsel secured. Nevertheless, based on her evaluation of Gonzales and her extensive record review, Dr. Milam concluded that "[t]here was no brain damage; none whatsoever," that Gonzales started out with a normal brain despite school records showing that he was developmentally delayed, and that "[h]is IQ is within normal limits; his brain is within normal limits, in spite of all the drugs." Now, Gonzales argues that his trial counsel were ineffective because the tests that Dr. Milam conducted were "suboptimal" and the scope of her inquiry was "less than adequate," and therefore counsel should have secured an FASD expert. Gonzales's habeas counsel obtained an FASD expert who preliminarily concluded that "FASD should be HIGHLY SUSPECTED and that a thorough diagnostic evaluation to address this should be undertaken." Importantly, Gonzales does not present evidence that he *actually* suffers from FASD. Instead, he presents an expert declaration concluding that "there is basis for further evaluation to determine definitively whether FASD is present or not" and argues that several additional tests should be conducted. The district and state courts denied Gonzales's various requests for funding to have those additional tests run, and so Gonzales is left only with an affidavit indicating that he may have FASD.

"To prevail on an ineffective assistance claim based upon uncalled witnesses, an applicant must name the witness, demonstrate that the witness would have testified, set out the content of the witness's proposed testimony,

and show that the testimony would have been favorable." *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010). A petitioner "who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *Id.* (quotation marks and citation omitted). Since there is insufficient persuasive evidence that Gonzales actually suffers from FASD, his argument is that he has made a substantial showing of ineffective assistance of trial counsel because his trial attorneys did not seek out an expert who would have testified that Gonzales may have FASD. Inconclusive new evidence that a petitioner may or may not suffer from some sort of cognitive dysfunction does not generally establish an ineffective assistance of counsel claim. *See Smith v. Quarterman*, 515 F.3d 392, 405 (5th Cir. 2008).

Trial counsel chose to offer the testimony of a qualified neuropsychologist who, after extensive testing, concluded that Gonzales had no brain damage but exhibited some schizotypal and antisocial personality features and suffered from reactive attachment disorder. There is no evidence that trial counsel's reliance on Dr. Milam was unreasonable. *See Harrington v. Richter*, 562 U.S. 86, 107 (2011) ("Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies."); *Couch v. Booker*, 632 F.3d 241, 246 (6th Cir. 2011) ("Trial counsel may rely on an expert's opinion on a matter within his expertise when counsel is formulating a trial strategy."). Gonzales has not made a substantial showing that his counsel were ineffective for failing to secure an FASD expert.

### 2.    Abuse

Gonzales next claims that his trial counsel were ineffective for failing to secure an abuse expert. He states that "[n]o expert addressed the synergy of the effects of [his] sexual victimization, emotional and physical abuse, neglect

and rejection by his mother and caregivers, exposure to alcohol and other drugs in utero, and his own substance abuse problem with the fact that he was only 72 days past his 18th birthday at the time of the offense in this case." Gonzales does not identify an expert that trial counsel should have called or specify precisely how such an expert's testimony would have differed substantially from that provided by Dr. Milam at trial. Gonzales's claim of ineffective assistance of trial counsel for failure to call a particular witness requires a showing of what that witness would have testified to if called. *See Gregory*, 601 F.3d at 352-53. Gonzales has made no such showing.

Additionally, Gonzales does not argue that the jury did not hear about his "sexual, emotional, physical, biological abuse," instead claiming that trial counsel should have called an expert to inform the jury "how the presence of all of these issues impacted" Gonzales. Counsel did call an expert—Dr. Milam—to explain the cumulative effect of the abuse and neglect that Gonzales suffered throughout his life. Trial counsel explained to the jury that "[a]t the very end of [the testimony of the defense's] witnesses it will all be wrapped up together and tied together by an expert in the field of psychology." As promised, after eliciting first-hand testimony about Gonzales's deeply troubled upbringing, trial counsel called Dr. Milam to give her expert opinion as to the psychological consequences of the neglect, abuse, and drug use on Gonzales. Dr. Milam testified that Gonzales (a) basically raised himself; (b) was developmentally delayed; (c) is immature; (d) is paranoid; (e) suffers from reactive attachment disorder; (f) has antisocial personality features; (g) has schizotypal personality features; (h) abused drugs from a young age; and (i) was probably in the top 10% of emotionally damaged children. Dr. Milam testified that many, if not all, of these issues were connected with his mother's use of drugs while pregnant, his severely neglected childhood, and the pervasive emotional, physical, and sexual abuse he suffered throughout his

No. 14-70006

childhood. Beyond Dr. Milam's extensive testimony, additional testimony by an abuse expert would most likely have been cumulative, and Gonzales does not show otherwise. *See Coble v. Quarterman*, 496 F.3d 430, 436 (5th Cir. 2007) ("Counsel's decision not to present cumulative testimony does not constitute ineffective assistance."). Accordingly, Gonzales has not presented a substantial claim that his trial counsel were constitutionally ineffective. As a result, Gonzales's state habeas attorney was not ineffective for failing to argue ineffective assistance of trial counsel, and Gonzales therefore cannot overcome the procedural default of his ineffective assistance of trial counsel claim. *See Garza*, 738 F.3d at 676.

## II.    Testimony as to Future Dangerousness

Gonzales maintains that he is also entitled to a COA because the district court improperly permitted the prosecution to present expert witness testimony from Dr. Gripon as to future dangerousness during the mitigation phase of his trial. Gonzales argues that the State failed to establish that Dr. Gripon's testimony was sufficiently reliable to be admissible as required by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[3] Gonzales properly raised his *Daubert* claim before the CCA on direct appeal and the CCA rejected the claim on the merits. Due to binding precedent, Gonzales cannot show that jurists of reason would debate whether the state court's denial of his claim was unreasonable.

In *Barefoot v. Estelle*, 463 U.S. 880 (1983), the Supreme Court held that psychiatric testimony predicting a capital defendant's future dangerousness is not per se improper. *Id.* at 898-99. Gonzales's arguments to the contrary notwithstanding, our court has consistently held that *Daubert* did not overrule

---

[3] Although the State discerned five separate points of error raised by Gonzales as to expert testimony regarding future dangerousness, all of Gonzales's arguments focus exclusively on the reliability of Dr. Gripon's future dangerousness testimony under *Daubert*.

12

No. 14-70006

*Barefoot* for the proposition that expert testimony regarding future dangerousness is permissible. *See, e.g.*, *Williams v. Stephens*, 761 F.3d 561, 571 (5th Cir. 2014) (maintaining that expert future dangerousness testimony is permissible under *Barefoot* and stating that petitioner's "contention that the Supreme Court may overrule *Barefoot* in light of *Daubert* is completely speculative"); *Roberts v. Thaler*, 681 F.3d 597, 608-09 (5th Cir. 2012) ("*Barefoot* stands for the proposition that expert testimony predicting a defendant's future dangerousness is not per se inadmissible."); *Flores v. Johnson*, 210 F.3d 456, 456 n.1 (5th Cir. 2000) (per curiam). Because expert evidence predicting a capital defendant's future dangerousness is permissible under *Barefoot*, jurists of reason would not debate whether the CCA reasonably determined that Dr. Gripon's testimony was properly allowed.

## CONCLUSION

For the foregoing reasons, Gonzales has not made the showing required to obtain a COA and his motion for a COA is therefore DENIED.

13