# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 21, 2025

Lyle W. Cayce
Clerk

No. 24-70004

John Allen Rubio,

*Petitioner—Appellant*,

*versus*

Eric Guerrero, *Director, Texas Department of Criminal Justice, Correctional Institutions Division*,

*Respondent—Appellee*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 1:18-CV-88

Before Jones, Duncan, and Douglas, *Circuit Judges*.

Per Curiam:[*]

In 2010, John Allen Rubio was convicted of four counts of capital murder and sentenced to death. Following a series of post-conviction remedy attempts in state court, he petitioned the United States District Court for the Southern District of Texas for a writ of habeas corpus. The district court determined that Rubio was not entitled to habeas relief, and denied both the

---

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

petition and a certificate of appealability ("COA").  He now requests a COA from this court.  For the reasons that follow, we DENY his motion.

## I

## A

The facts surrounding Rubio's crime are especially harrowing.  Rubio and his co-defendant, Angela Camacho, were common-law partners.  After a period of living without a consistent home, Rubio, Camacho, and Camacho's two children moved into a house that lacked electricity or running water.[1]  Soon after moving in, Rubio asked Camacho what she would do if he killed the children; Camacho wrote it off, figuring he was joking.

Several months later, while Camacho was pregnant with the youngest child, Mary Jane, Child Protective Services ("CPS") removed Julissa and John and placed them with Camacho's mother.   The couple complied with CPS's requirements, taking parenting classes while Rubio underwent drug testing and obtained employment.  The children were ultimately returned, but Rubio soon lost his job and resumed his pattern of substance abuse.  Mary Jane was born soon thereafter, in January 2003.

While unemployed, Rubio earned money by washing cars and as a "prostitute," ECF 31-1, at 11; nevertheless, the family was short on money.  Rubio's mother, who also was a "prostitute," ECF 31-1, at 11, and struggled with substance abuse, lived with them but rarely covered her share of the rent.  Tight on money, Rubio and Camacho feared eviction.  To cover their costs, Rubio's lover, Jose Luis Moreno, would provide him with money and

---

[1] Julissa and John were both Camacho's children by a previous relationship.  Mary Jane, the youngest, was the child of Rubio and Camacho.

groceries.    Moreno, however, would also provide Rubio with various addictive substances, predominantly spray paint.

Despite the couple's financial woes, the children were generally healthy and well-nourished, as Rubio and Camacho frequently walked them to a nearby charitable organization that provided lunch and dinner.  They also received food stamps.

One day, however, the couple received a notice that Julissa's food stamp benefits would be terminated due to issues with her social security number.    In March 2003, on the day before the murders, the hospital informed the couple that it could not provide the necessary records to the government to remedy the issue with Julissa's records.

 As they bussed home from the hospital, Rubio began proclaiming that everybody surrounding them wanted to hurt them, despite Camacho's assessment that the area was generally safe.  Rubio claimed that a lady at the bus stop wanted to steal his money, and that a young girl on the bus who offered a piece of candy to John had poisoned the gift.  When they exited the bus, a "woman with dark marks on her forehead" allegedly gestured rudely to Camacho, which Rubio identified as "the devil's sign."  Frightened, they hurried home.

Upon return, Rubio swept an egg over Julissa and cracked it into a glass of water.  Examining the glass, he determined that someone had "done something evil to Julissa."  In fear, the couple considered relocating to a motel for the evening, but they could not locate Rubio's wallet.  They ultimately concluded that an acquaintance had stolen it.  Unfortunately, the wallet contained that month's rent, which was due the next day.

At approximately 2:00 a.m., Rubio's mother returned home.  Rubio requested that she provide her share of the rent, but she, too, was without money.  He then asked his mother, whom he believed to be a witch, to fight

off the children's evil spirits, but she declined.  Instead, she informed him that he had the power to fight off the spirts, and that he would need to use it.  She left the house at 3:00 a.m.

Rubio subsequently nailed the back door shut "to keep bad spirits from entering the apartment."  He killed the family's pet hamsters with a hammer and bleach because he believed them to be possessed, and began speaking about the anti-Christ and an impending battle between good and evil.[2]

Later that day, Rubio determined that the children were possessed and that he would kill them.  After ordering Camacho into the bathroom, he decapitated their two-month-old child, Mary Jane, and then requested Camacho's assistance.  He placed Julissa, who was struggling mightily, on the floor next to Mary Jane's body and ordered Camacho to hold Julissa's legs while he stabbed and decapitated her.

Rubio washed the girls' bodies and put them into trash bags.  He told Camacho to clean the carpet and knife while he placed the girls' heads into a bucket in the kitchen.  Rubio then claimed that John still had evil energy; he and Camacho restrained him, and Rubio decapitated him as well.  Following the murders, he forced Camacho to engage in sexual intercourse with him under threat of gang rape, and the pair showered.

Rubio's brother arrived at the house shortly thereafter and called the police.  Rubio surrendered, stating: "[J]ust arrest me I know I did something bad but I rather my children be dead than be possessed."  Camacho provided three police statements corroborating Rubio's account, with some minor

_____

[2] Camacho later testified that Rubio only ever acted abnormal when he inhaled spray paint.  However, Camacho claimed that Rubio had not used spray paint for the previous five days.

timeline inconsistencies. The State charged Rubio with four counts of capital murder.

B

Rubio underwent two separate trials. He was convicted and sentenced to death in the first, in large part based on out-of-court statements made by Camacho, who was unavailable as a witness during trial after invoking her Fifth Amendment right against self-incrimination. After that trial, however, the Supreme Court issued *Crawford v. Washington*, 541 U.S. 36 (2004), which altered Confrontation Clause jurisprudence. Rubio's conviction was consequently overturned. He was re-tried, convicted, and sentenced to death. He appealed, and his conviction was affirmed.

In October 2013, Rubio petitioned for a writ of habeas corpus in state court. In August 2016, the state habeas court held an evidentiary hearing, following which Rubio filed a supplemental habeas application that raised four more grounds. In April 2017, the state habeas judge issued findings of fact and conclusions of law regarding the merits of the original 2013 petition, recommending that the Texas Court of Criminal Appeals ("TCCA") deny the relief requested. The judge also found that the 2016 supplemental application was a subsequent application and directed it to the TCCA. Ultimately, the TCCA denied the 2013 habeas petition and found that the 2016 supplemental habeas petition was an abuse of the writ because it did not qualify under the state's successive petition law.

In September 2019, Rubio filed a petition for writ of habeas corpus in federal court and amended it five months later, raising ten claims. Only one of those claims, however, had previously been presented to the state courts, so the district court stayed the case to permit Rubio to exhaust his state-court remedies by raising the other nine grounds in the TCCA. After the TCCA dismissed his successive habeas petition as an abuse of the writ, he submitted

his second amended petition to the district court. The district court denied all grounds of relief and denied him a COA. He now moves this court for a COA.

## II

When a petitioner seeks to appeal a district court's denial of habeas relief, they must, pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), make a "substantial showing of the denial of a constitutional right" to be granted a COA. 28 U.S.C. § 2253(c)(2). This requirement is jurisdictional: the appeal may not be taken without its issuance. *Id.* § 2253(c)(1).

To demonstrate the violation of a constitutional right, the petitioner must satisfy § 2253(c)(2), which requires them to "show that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (alteration omitted) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). And, where the claim is disposed of on procedural grounds, the petitioner must demonstrate "that jurists of reason would find it debatable whether the petition states a valid claim on the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 478.

When the petitioner seeks a COA on claims denied on the merits by a state court, § 2254(d), as amended by the AEDPA, "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Hardy v. Cross*, 565 U.S. 65, 66 (2011) (per curiam) (quoting *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam)). Our review is "limited to the record that was before the state court that adjudicated the claim on the merits, . . . [and] requires an

examination of the state-court decision at the time it was made." *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011). Under 28 U.S.C. § 2254(d), we will not grant a petition for a writ of habeas corpus with respect to a claim adjudicated on the merits in state court, unless that adjudication (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

## III

Rubio seeks a COA on the following overarching grounds: (1) ineffective assistance of counsel for failure to reasonably investigate his prenatal exposure to alcohol; (2) ineffective assistance of counsel for failure to investigate and prepare his insanity defense; and (3) violation of his due process rights under *Napue v. Illinois*, 360 U.S. 264 (1959), by solicitation of false testimony. Because "[n]o reasonable jurist could find the district court's assessment [of the *Strickland* issue] debatable or wrong," *Brewer v. Lumpkin*, 66 F.4th 558, 565 (5th Cir. 2023), we deny his COA. *See Slack*, 529 U.S. at 484.

## A

Rubio first requests a COA for his claim of ineffective assistance of counsel for failure to investigate his prenatal alcohol exposure. Because he preserved this issue during state-court habeas proceedings, § 2254(d) controls. The relevant "analysis includes layers of deference to both trial counsel and the state court, rendering it 'doubly deferential.'" *Holberg v. Lumpkin*, No. 21-70010, 2023 WL 2474213, at *4 (5th Cir. Mar. 13, 2023) (quoting *Cullen*, 563 U.S. at 190). To prevail on the merits, Rubio must show "that there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different,"[3] keeping in mind that "strategic choices must be respected in these circumstances if they are based on professional judgment." *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 681, 694 (1984)).

The district court, considering this claim, described the relevant information regarding fetal alcohol syndrome ("FAS"): it "is one of several different disorders under what is now recognized as the umbrella 'fetal alcohol spectrum disorder.'" An individual who has fetal alcohol spectrum disorder ("FASD")[4] may experience mental and physical defects, including stunted fetal growth or weight, facial dysmorphia, damaged brain structures, or other physical damage. Rubio argues that trial counsel overlooked the possibility that other effects associated with FASD contributed to his acts and mental capacity, and that his counsel failed to adequately explore this possibility.

He noted before the state court that the following red flags should have inspired trial counsel to investigate the possibility that he suffered from FASD: (1) his bizarre behavior; (2) testimony that his mother consumed drugs and alcohol while pregnant; (3) Dr. Fabian's report from 2009 signaling that Rubio's mother's alcohol use increased prenatal risk factors; (4) Dr. Pinkerman's report identifying prenatal alcohol abuse; (5) a letter from Dr. Brams linking developmental issues to his parents; and (6) reports

---

[3] In other words, Rubio must demonstrate "(1) that his trial counsel rendered deficient performance, and (2) that the deficient performance resulted in actual prejudice." *King v. Davis*, 883 F.3d 577, 586 (5th Cir. 2018).

[4] FASD "is a non-diagnostic umbrella term that encompasses all four of the diagnostic categories caused by prenatal alcohol exposure that were described in the diagnostic guidelines published in 1996 by the Institute of Medicine of the National Academies." Brown Report, at 41.

from Drs. Martinez and Morris regarding Rubio's mother's drug and alcohol abuse.[5]

The state habeas court held an evidentiary hearing regarding the effectiveness of counsel as it related to their investigation of FAS and FASD. Rubio's habeas counsel elicited testimony from his trial counsel, Ed Stapleton, who explained that he chose not to pursue the FASD theory because (1) Rubio did not have facial dysmorphia; (2) Dr. Owens's report proved inadequate to demonstrate brain damage; (3) Dr. Morris did not identify a deficiency in Dr. Owens's report; and (4) the defense was poorly funded. At some point during the testimony, Stapleton's trial co-counsel, Nathaniel Perez, shouted out from the gallery that they provided Rubio ineffective assistance of counsel. The court acknowledged the attorneys' humility and willingness to "fall[] on the sword" but noted that they "worked with what [they] had."

Although the state court acknowledged counsels' awareness of Rubio's mother's alcoholic intake, it denied the ineffective assistance of counsel claim. First, it noted that "there [was] insufficient evidence to find that, at the time of [Rubio's] trial . . . , the development, investigation[,] and presentation of a full-scale FASD based defense was reasonably available to trial counsel." Second, trial counsel thoroughly investigated Rubio's behavior, and relied on medical experts' findings that it was inspired by something other than FASD. Third, an argument premised on FASD is a double-edged sword: while it may assist in mitigation, it also harms the defendant's position in the future danger inquiry; thus, the attorneys made a strategic decision in determining how much to focus on FAS. Fourth, and

_____

[5] In the present motion, he claims that the primary "red flags" come from (1) his 2003 trial; (2) the investigation leading up to the 2010 trial; and (3) the competency hearing before the 2010 trial.

finally, Rubio failed to demonstrate that the jury would have answered the mitigation inquiry differently.

The federal district court found that "fairminded jurists could [not] disagree that the state court's decision conflicts with [the United States Supreme] Court's precedents." It walked through the evidence, noting that trial counsel investigated the connection between Rubio's mother's substance abuse and his behavior, including by seeking the opinions of several experts. Further, Rubio failed to demonstrate that any doctor ever conclusively diagnosed him with FASD. Instead, the court noted that Rubio's counsel formulated a strategy reasonable at the time. It also found that the TCCA properly considered the prejudice prong under *Strickland*, and that Rubio has not demonstrated that fairminded jurists would disagree with that conclusion.

After review of the record, we, too, find that reasonable jurists could not disagree with the conclusion that Rubio's trial counsel was effective. *See Dunn v. Reeves*, 594 U.S. 731, 739–40 (2021) ("[A] federal court may grant relief only if *every* 'fairminded juris[t]' would agree that *every* reasonable lawyer would have made a different decision." (second alteration in original)). His attorneys sought the opinions of several doctors, investigated the possibility of FAS, and, while they may have been misled by an over-emphasis on the importance of facial dysmorphia, they considered the defense to the extent they could.[6] *See Rompilla v. Beard*, 545 U.S. 374, 383

---

[6] Rubio's motion primarily focuses on his attorneys' misconception that facial dysmorphia is required for FASD. It is true that Dr. Natalie Brown provided a report that noted that "FASD tends to be a hidden condition because most people in this population have [alcohol related neurodevelopmental disorder] rather than FAS and consequently, no obvious physical abnormalities." But Rubio says nothing to truly dispute the state habeas court's factual determination that "trial counsel conducted a thorough and detailed investigation into the cause of [Rubio's] bizarre behavior by retaining numerous medical doctors and mental health experts who examined [Rubio] and opined that the cause of this

No. 24-70004

(2005) ("[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste."); *Gonzales v. Stephens*, 606 F. App'x 767, 772–73 (5th Cir. 2015) (rejecting ineffective assistance of counsel claim where defense counsel secured a neuropsychologist who "concluded that Gonzales had no brain damage"). Reasonable jurists could not debate that the investigation and presentation of this defense failed to amount to the "reasonably effective assistance" *Strickland* requires, especially under the strength of the double deference we provide state-court rulings. *See Dunn*, 594 U.S. at 739–40. And, because Rubio has failed to show that his attorneys fell below the *Strickland* standard, we need not consider the prejudice prong.[7]

---

behavior was something other than FASD." Specifically, these doctors made the following diagnoses, potentially among others: "delusional disorder with other psychotic features; severe learning disorder; schizophrenia, paranoid type; major depressive disorder, recurrent; inhalant dependence; cannabis abuse; psychotic disorder NOS (not otherwise specified); and, Attention Deficit Hyperactivity Disorder (ADHD)." Rubio does not successfully contest these statements or demonstrate that his attorneys committed "unprofessional errors," *Cullen*, 563 U.S. at 190, especially considering that the state court's factual determinations are "presumed correct" unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

[7] Rubio provides lengthy arguments in both his motion and reply brief that the district court failed to consider § 2254(d)(2), instead premising its findings on § 2254(d)(1). While § 2254(d)(1) precludes the grant of a petition for writ of habeas corpus unless the state court's determination "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(2) allows a reversal of the state court's denial if it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Rubio makes no showing that the state court, in light of all of the evidence in its proceedings, made an unreasonable determination of facts. As described above, the federal district court identified several facts that the state court weighed in determining that Rubio's counsel was not ineffective. Among these facts is that Rubio was never diagnosed with FASD and that counsel investigated the possibility that he had FASD. While the district court ultimately stated its conclusion under § 2254(d)(1), there is no indication that

11

B

Rubio next requests a COA for review of his claim that his counsel was ineffective by failing to investigate and prepare his insanity defense.[8] As the district court noted, Rubio failed to present this claim in 2013 during his state habeas proceedings, so the TCCA refused to consider the merits of the claim under the state's procedural bar. The claim is therefore procedurally defaulted because "the last state court to review the petitioner's claims unambiguously based its denial on a state procedural bar." *Mullis v. Lumpkin*, 47 F.4th 380, 387–88 (5th Cir. 2022) (quoting *Gonzales v. Davis*, 924 F.3d 236, 243 (5th Cir. 2019) (per curiam)). Rubio bears the burden of demonstrating that an exception to this rule applies to be granted a COA. *See McCleskey v. Zant*, 499 U.S. 467, 494 (1991), *superseded by statute on other grounds*, AEDPA, 28 U.S.C. § 2244(b), *as recognized in Banister v. Davis*, 590 U.S. 504 (2020).

As the district court rightly pointed out, ineffective representation by state habeas counsel may be sufficient cause to overcome the procedural bar for an ineffective assistance of *trial* counsel claim. *Martinez v. Ryan*, 566 U.S.

---

it erred in failing to proclaim the same determination under § 2254(d)(2). Indeed, Rubio's most direct attack is that the state habeas court improperly found that Rubio's attorneys were aware of red flags because one "testified under oath that the reason they abandoned an FASD investigation was because he thought FASDs required facial dysmorphia and Rubio had none." But the very next sentence in Stapleton's testimony was that, while he believed facial dysmorphia was required, he investigated FASD until he "got Dr. Owens's report on Fetal Alcohol Syndrome or *lack of* Fetal Alcohol Syndrome." Rubio has not provided clear and convincing evidence that the state court erred in its factual determinations.

[8] Rubio's motion notes that this second request incorporates Claims Three and Seven asserted before the district court, which the court had considered under the greater "mental health" challenges umbrella. We therefore eschew consideration of the third claim that the district court considered in that grouping, identified as Claim One and relating to failure to include a qualified mental health expert on the defense team.

1, 17 (2012). Therefore, Rubio must satisfy the *Strickland* test: that *trial* counsel was so deficient that they were "not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," thus "prejudic[ing] the defense." *Strickland*, 466 U.S. at 687. *Then* he must demonstrate "that habeas counsel was ineffective in failing to present those claims in his first state habeas proceeding." *Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013).

1

Rubio's first argument under his overarching "mental health" challenge is that his trial counsel failed to investigate and prepare his insanity defense. He argues that his attorneys misunderstood the proper Texas legal standard for a not-guilty-by-reason-of-insanity defense, and that they failed to provide the proper standard to their expert witnesses.

The district court found that Rubio failed to demonstrate that his trial counsel either misunderstood the legal standard, or that they examined witnesses with the improper standard. It noted that Rubio raised this same habeas challenge to the TCCA after his first conviction, which provided Rubio's counsel with "the benefit of the TCCA's decision, including its unambiguous recitation of Texas law regarding an insanity defense." *See Rubio v. State*, 241 S.W.3d 1, 9 (Tex. Crim. App. 2007) ("[The primary issue to be resolved at trial was] whether the appellant, at the time of the conduct charged, as a result of severe mental disease or defect, did not know that his conduct was wrong."); *id.* at 12 (Keller, J., dissenting) (noting that "wrong" in this context means "illegal"). The court further provided excerpts of trial testimony in which his attorney referred the expert witness to the correct legal standard, asking that the witness "assume that there is some Texas case

law that says . . . knowledge of 'wrong' means knowledge of 'illegal.'"[9] And it rejected any claim based on the fact that Dr. Morris inadvertently erred in describing the legal standard in his expert report.[10]

Considering the record, Rubio has failed to show that he has a substantial claim, and he has pointed us to no portion of the district court's analysis with which fairminded jurists would disagree.[11] Because Rubio fails

_____

[9] "It is an affirmative defense to the prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." TEX. PENAL CODE § 8.01(a). "Under Texas law, 'wrong' in this context means 'illegal.'" *Ruffin v. State*, 270 S.W.3d 586, 592 (Tex. Crim. App. 2008). The pertinent question, therefore, is whether "the defendant factually know[s] that society considers this conduct against the law, even though the defendant, due to his mental disease or defect, may think that the conduct is morally justified." *Id.*

[10] It is true that Dr. Morris's expert report misstated the standard of review in its opinion. He admitted that he "probably should have" looked more closely at that line. But he also unequivocally stated that weeks prior to trial he came to the conclusion that Rubio "did not know that [his action] was wrong." Indeed, he consistently stated that he felt that Rubio did not understand the consequences when committing the act, even though another expert witness testified before the jury that Rubio acted "regardless of the consequences."

[11] Rubio asserts that the district court engaged in "claim-splitting" by failing to consider all of Rubio's allegations under this claim cumulatively. There is no evidence that the district court failed to consider the evidence under the totality of the circumstances. While the district court singled out several allegations, it noted that none was significant, and they deserved little weight given Rubio's "limited attention" provided to them and their lack of relation "to the main thrust of his claim."

Finally, to the extent that he challenges the district court's prejudice determination, the district court rightly emphasized that the jury had heard evidence demonstrating Rubio's knowledge of the wrongfulness of his action; he failed to show that he would have been found not guilty with the "proper" legal standard. For instance, Rubio instantly surrendered to officers, telling them to "just arrest" him because while he "kn[ew] [he] did something bad," he "rather[ed] [his] children be dead than be possessed." He also informed officers in a statement that he "told [his] wife that [they] should make love for the last time because [they] were going to jail." Moreover, Camacho testified that Rubio planned to flee to Mexico; Rubio asked the detective, "I killed the children, what more do you need?"; he purchased cleaning supplies in advance of the murders; and Dr. Morris, when asked about Rubio's "arrest me" statement, said that he

to make this showing, we do not consider whether he can clear the procedural default.

2

Rubio's other mental-health-based challenge surrounds the failure to introduce medical records from his time spent in prison, which he contends demonstrate his mental illness. He believes that such evidence could controvert other testimony that showed that Rubio was not on antipsychotic medication while incarcerated.

As with the legal standard claim, the district court found that Rubio failed to clear the substantial claim hurdle. Instead, the court found that his trial counsel possessed the prison records and had to balance a "mixed bag" of double-edged evidence: while he may have been prescribed the medication, he often refused to take it. Further, the records demonstrated that Rubio's odd behavior was often self-reported and an atypical form of psychosis, all of which were reviewed by the relevant expert witness. The district court concluded that counsels' "decision not to utilize [the records] falls within the type of reasonable strategic decisions of trial counsel." Having reviewed the briefing and the record, Rubio has failed to show that his attorneys fell below the *Strickland* standard.

Because "[n]o reasonable jurist could find the district court's assessment debatable or wrong, *Brewer*, 66 F.4th at 565, we deny his motion for a COA as to this claim. *See Slack*, 529 U.S. at 484.

───────────────────────────

"think[s] that . . . you have to consider [it] a possibility" that such a statement is an "indication that [Rubio] knew what he had done was wrong." *See Ex Parte Rubio*, No. 65,784-04 and No. 65,784-04, 2018 WL 2329302, at *2 (Tex. Crim. App. May 23, 2018). While he may have considered his actions "morally justified," he also clearly knew that "society considers this conduct against the law." *Ruffin*, 270 S.W.3d at 592.

No. 24-70004

C

As to the district court's umbrella category of "expert witnesses," Rubio only requests a COA for his *Napue* claim that the State knowingly elicited false testimony from Dr. Michael Welner. As with his mental health claims, Rubio's petition before the state habeas court regarding his *Napue* claim was dismissed as an abuse of the writ, and it is therefore procedurally defaulted. Once again, because he fails to make a substantial claim, we do not reach the procedural default issue.

Underlying this claim is the testimony of State rebuttal witness Dr. Welner, a forensic psychologist who had interviewed both Rubio and those who knew him. Dr. Welner interviewed Rubio for fourteen hours approximately one month before his re-trial. *Rubio v. State*, No. AP-76,383, 2012 WL 4833809, at *11 (Tex. Crim. App. Oct. 10, 2012). He determined that Rubio did not suffer from a severe mental disease at the time he committed offense because (1) there were several instances of Rubio's alleged delusion that were undercut by his statements or actions,[12] and (2) while he did not consistently take anti-psychotic medications, he also did not generally demonstrate symptoms.

Rubio, however, contends that the State knew (or should have known) that Dr. Welner provided false testimony when he claimed that (1) Rubio failed to take his anti-psychotic medication and (2) his absence of symptoms of psychosis during that time suggested that he lacked the alleged mental

---

[12] For instance, before ever claiming that he committed the murders "because he was the 'chosen one,'" he asserted that he did so because Camacho instructed him to. *Rubio*, 2012 WL 4833809 at *11. He told the officers he almost called the police right after the offense, and he deflected responsibility onto Camacho rather than immediately confessing. *Id.* He also allegedly recognized Julissa when he killed her, inconsistent "with his professed delusion that his deceased grandmother had possessed [her]." *Id.*

health disorder. As with the mental health ineffective assistance of counsel claim, he asserts that his medical records from the jail show that he reported his hallucinations and delusions while incarcerated. This, he claims, proves that Dr. Welner's testimony was false.

For Rubio to succeed on such a claim, he "must show that the prosecution knowingly solicited false testimony or knowingly allowed it 'to go uncorrected when it appear[ed].'" *Glossip v. Oklahoma*, 145 S. Ct. 612, 626 (2025) (quoting *Napue*, 360 U.S. at 269). The district court properly determined that the record did not support a conclusion that Dr. Welner falsely testified. As it explained, the record demonstrated Rubio's refusal to take prescribed medication and his feigned symptoms of mental illness. Indeed, Dr. Welner testified about several reasonable explanations for Rubio's reported hallucinations other than insanity, and described how some of his behaviors were inconsistent with insanity. To the extent that Rubio challenges that conclusion, he does not provide any evidence that shows that it was improper. Instead, much of the evidence is self-serving or inconclusive. One record to which he points us notes "[patient] reports medication compliance." Another notes that "[h]e stated that he has been on meds for 'years.'" Yet another merely notes the various medications that he was prescribed, none of which appear to actively treat schizophrenia or psychosis. While it is true that one record from 2006 notes his "strong meds. compliance," including by taking Chlorpromazine—which treats schizophrenia—in fifty-four out of sixty relevant instances, this single medical record is insufficient to overcome the wealth of other evidence that supports Dr. Welner's statement. Further, the district court found that the statements were not material and that Rubio failed to show that the State

No. 24-70004

knew it elicited false testimony.[13]  Rubio has failed to demonstrate that Welner's testimony violates *Napue*.

## IV

For the reasons described above, Rubio has failed to demonstrate that any of his claims merit the grant of a COA and further review of the district court's opinion.  Accordingly, his motion for a COA is DENIED.

---

[13] There is not a "reasonable likelihood [this statement] [could] have affected the judgment of the jury." *Glossip*, 145 S. Ct. at 626–27 (second alteration in original) (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)).  This statement merely provided the jury one of several reasons that Dr. Welner did not believe Rubio suffered from psychosis.  Nor was Dr. Welner a "star witness" for the prosecution, as was the case in *Glossip*, because other sources introduced substantial evidence of Rubio's sanity. *See id.* at 623; *id.* at 634 (Barrett, J., concurring in part and dissenting in part).  The State elicited testimony from one of Rubio's fellow inmates, Jose Luis Gutierrez, that Rubio stated "[t]hat his attorney had tell [*sic*] him not to pass the IQ test so he can get insane - - not insane, or insane. He was trying to plea he was crazy."  Another inmate, Rolando Garza, later testified that he overheard Rubio telling Gutierrez "that he was going to say that he was insane."  When Garza "told [Rubio] he wasn't crazy or insane," Rubio "shushed him and said, yeah, but they don't know that."  These statements were corroborated by others.  Before his incarceration, Rubio had told a friend that he "kn[ew] how to commit the perfect crime; just say you are insane."  This testimony, among other evidence, casts doubt that, even if there were a *Napue* violation, it "prejudiced the defense." *Id.* at 629.